OPINION OF THE COURT
Cooke, J.
Challenged here as violative of the due process clauses of the State Constitution (NY Const, art I, § 6) and the Fourteenth Amendment of the Federal Constitution is the statutory authorization afforded a garageman to foreclose his possessory statutory lien for repair and storage charges (Lien Law, § 184), by means of a public sale of the vehicle in his possession. We hold that sections 200, 201, 202 and 204 of the Lien Law, insofar as they empower a garageman to conduct an ex parte sale of a bailed automobile, fail to comport with traditional notions of procedural due process embodied in the State Constitution, as they deprive the owner of the vehicle of a significant property interest without providing any opportunity to be heard.
On October 12, 1975, plaintiff’s husband took her 1970 Cadillac to Dell Buick-Cadillac, Inc. (Dell), for installation of a replacement engine he had purchased elsewhere. The husband signed a work authorization wherein it was agreed that Dell was to remove the defective engine and install its replacement for the sum of $225. The affidavits of plaintiff and her husband recite that the work authorization form contained no provisions with respect to storage charges which were subsequently unilaterally imposed by Dell. Approximately one week later, plaintiff’s husband offered to pay the $225 to Dell, but was advised by its service manager to withhold payment until the engine was installed.
Unfortunately, the replacement engine proved to be defective and had to be removed. Delivery of a replacement engine was then arranged. When the new replacement engine arrived, Dell informed plaintiff’s husband that it would not be installed until Dell was paid the $225 due for the installation of the original defective engine. Although he agreed to pay this sum, plaintiff’s husband did not have that amount of money with him at the time and soon thereafter was hospitalized, rendering him incapable of continuing his business dealings with Dell.
On January 14, 1976 plaintiff received a "Notice of Lien and Sale” by certified mail, informing her that pursuant to section *157 184 of the Lien Law Dell had imposed a possessory lien against the Cadillac in the amount of $304.95. That notice further advised that if plaintiff did not tender this sum within 30 days, the automobile would be sold at public auction on March 15, 1976 (see Lien Law, § 200). Plaintiff was subsequently informed by one of the auctioneers listed on the notice of sale that, her belief to the contrary notwithstanding, included in the lien was the sum of $79.95, representing storage charges. However, the auctioneer did agree to contact Dell in order to ascertain whether they would "take off” the storage charge from the amount due.
Several days later, the auctioneer informed plaintiff that Dell refused to waive its storage charge and that the amount now due had been increased to $545. He also advised her that since the book value of the car was appreciably greater than $545, it would be to plaintiff’s advantage to pay the charges since Dell "had her over a barrel” because her husband had taken the car there for repair. On the day of the auction, March 15, 1976, Dell again modified its claim and informed plaintiff that the amount due had been reduced to $502. Later that day, plaintiff’s 1970 Cadillac, having an established resale value of between $1,200 and $1,400, was sold to Dell for the sum of $502.
Plaintiff then commenced the instant action for declaratory and injunctive relief, as well as damages, claiming that the sale provisions of the Lien Law are violative of her due process rights as they authorize public sale of her automobile without affording the opportunity for a hearing. Plaintiff’s motion for summary judgment was denied by Special Term on the ground that the affidavits submitted presented triable issues of fact. The Appellate Division modified, granting judgment to plaintiff declaring sections 200, 201, 202 and 204 of the Lien Law unconstitutional and granted leave to appeal to this court, certifying the following question for our review: "Was the order of this court, dated March 28, 1977, properly made?” We affirm, and answer the certified question in the affirmative.
The threshold question in any judicial inquiry into conduct claimed to be violative of the due process clause of the Fourteenth Amendment is whether the State has in some fashion involved itself in what, in another setting, would otherwise be deemed private activity (see US Code, tit 42, § 1983; Jones v Mayer Co., 392 US 409, 422-424). That much is *158 made plain by the express terms of the amendment which specifies that "nor shall any State deprive any person of life, liberty, or property without due process of law” (emphasis added). Purely private conduct, however egregious or unreasonable, does not rise to the level of constitutional significance absent a significant nexus between the State and the actors or the conduct (see Civil Rights Cases, 109 US 3, 11). This nexus has been denominated "State action” and is an essential requisite to any action grounded on violation of equal protection of the laws or a deprivation of due process of law. Further, it is settled that where the impetus for the allegedly unconstitutional conduct is private, the State must have "significantly involved itself’ in order for that action to fall within the ambit of the Fourteenth Amendment (Reitman v Mulkey, 387 US 369, 380).
Despite its outward simplicity as a concept, State action is in fact an elusive principle, one which cannot be easily discerned by resort to ritualistic incantations or precise formalisms (see Burton v Wilmington Parking Auth., 365 US 715, 722). Instead, a number of factors must be considered in determining whether a State is significantly involved in statutorily authorized private conduct. These factors include: the source of authority for the private action; whether the State is so entwined with the regulation of the private conduct as to constitute State activity; whether there is meaningful State participation in the activity; and whether there has been a delegation of what has traditionally been a State function to a private person (Melara v Kennedy, 541 F2d 802, 805). As the test is not simply State involvement, but rather significant State involvement, satisfaction of one of these criteria may not necessarily be determinative to a finding of State action.[1]
We need not address plaintiff’s contention that the actions taken by Dell are attributable to the State of New York for purposes of the due process clause of the Fourteenth Amend *159 ment. Recently, in Flagg Bros. v Brooks (436 US 149), the Supreme Court rejected the argument that a private sale of property subject to a warehouseman’s possessory lien pursuant to section 7-210 of the Uniform Commercial Code constitutes State action. The similarities between section 7-210 and the statutes at issue here might preclude any contrary finding by this court.[2]
But the mere fact that an activity might not constitute State action for purposes of the Federal Constitution does not perforce necessitate that the same conclusion be reached when that conduct is claimed to be violative of the State Constitution (see Ives v South Buffalo Ry. Co., 201 NY 271, 317; Oregon v Hass, 420 US 714, 719; Sibron v New York, 392 US 40, 60-61; Minnesota v National Tea Co., 309 US 551, 556-557). Indeed, on innumerable occasions this court has given our State Constitution an independent construction, affording the rights and liberties of the citizens of this State even more protection than may be secured under the United States Constitution (see, e.g., People v Isaacson, 44 NY2d 511; People ex rel. Walsh v Vincent, 40 NY2d 1049; People v Hobson, 39 NY2d 479, 483-484; People v Donovan, 13 NY2d 148, 151; Ives v South Buffalo Ry. Co., 201 NY 271, 317, supra). This independent construction finds its genesis specifically in the unique language of the due process clause of the New York Constitution as well as the long history of due process protections afforded the citizens of this State and, more generally, in *160 fundamental principles of federalism (see Johnson v Louisiana, 406 US 356, 376; New State Ice Co. v Liebmann, 285 US 262, 311 [Brandeis, J., dissenting]).
In contrast to the due process clause of the Fourteenth Amendment, which is phrased in terms of State deprivation of life, liberty or property, section 6 of article I of the New York Constitution guarantees that "[n]o person shall be deprived of life, liberty or property without due process of law.” Conspicuously absent from the State Constitution is any language requiring State action before an individual may find refuge in its protections. That is not to say, of course, that the due process clause of the State Constitution eliminates the necessity of any State involvement in the objected to activity (see Stuart v Palmer, 74 NY 183, 188). Rather, the absence of any express State action language simply provides a basis to apply a more flexible State involvement requirement than is currently being imposed by the Supreme Court with respect to the Federal provision.
The historical differences between the Federal and State due process clauses make clear that they were adopted to combat entirely different evils (see Schwartz, The Bill of Rights: A Documentary History, pp 161, 165, 387, 855-856). Prior to the Civil War, the Federal Constitution had as its major concern governmental structures and relationships. Indeed, prior to the enactment of the Fourteenth Amendment, the Bill of Rights delimited only the power of the National Government, imposing few restrictions on State authority and offering virtually no protections of individual liberties (see Barron v Mayor & City Council of Baltimore, 7 Pet [32 US] 243). The Fourteenth Amendment was a watershed — an attempt to extend and catalogue a series of national privileges and immunities, thereby furnishing minimum standards designed to guarantee the individual protection against the potential abuses of a monolithic government, whether that government be national, State or local (see Kurland, The Privileges or Immunities Clause: "Its Hour Come Round at Last”?, 1972 Wash U LQ 405; Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv L Rev 489, 501). In contrast, State Constitutions in general, and the New York Constitution in particular, have long safeguarded any threat to individual liberties, irrespective of from what quarter that peril arose. Thus, as early as 1843, Justice Bronson, in speaking of the due process clause of our State Constitu *161 tion, noted: "The meaning of the section then seems to be, that no member of the state shall be disfranchised, or deprived of any of his rights and privileges, unless the matter be adjudged against him upon trial and according to the course of the common law. It must be ascertained judicially that he has forfeited his privileges, or that some one else has a superior title to the property he possesses, before either of them can be taken from him” (Taylor v Porter, 4 Hill 140, 146; see, also, Wynehamer v People, 13 NY 378, 394 [1856]).
Examination of the indicies of State participation in nonjudicial foreclosure pursuant to the provisions of the Lien Law at issue here compels the conclusion that New York has so entwined itself into the debtor-creditor relationship as to constitute sufficient and meaningful State participation which triggers the protections afforded by our Constitution.
The garageman’s lien is a statutory declaration of the common-law artisan’s lien. At common law, a workman who by his labor enhanced the value of a chattel, obtained a lien upon it for the reasonable value of the work performed. That lien endowed the artisan with the exclusive right to possession of the repaired article until his charges were satisfied (1 Jones, Law of Liens, §§ 731, 749; Brown, Personal Property [2d], § 107, pp 505-511). The possessory nature of the garage-man’s lien is not in issue here, and in any event, does not constitute State action (see IDS Leasing Corp. v Hansa Jet Corp., 51 AD2d 536, affg 82 Misc 2d 741). For State action purposes, there is a fundamental distinction between a statute which, in regulating previously lawful conduct, does nothing more than merely acknowledge its lawfulness (Adams v Southern Cal. First Nat. Bank, 492 F2d 324, 333, n 24, cert den 419 US 1006), and one which authorizes otherwise impermissible or unconstitutional conduct (Tedeschi v Blackwood, 410 F Supp 34, 41-42 [three-Judge court]).
As noted, common law afforded the garageman only the right to possession; it was the State which authorized enforcement of the lien by means of ex parte sale of the vehicle without first affording its owner an opportunity to be heard (see L 1909, ch 38, as amd). Thus, New York has done more than simply furnish its statutory imprimatur to purely private action. Rather, it has entwined itself into the debtor-creditor relationship arising out of otherwise regular consumer transactions. The enactment of substantive provisions of law which authorize the creditor to bypass the courts to carry out the *162 foreclosure sale encourages him to adopt this procedure rather than to rely on more cumbersome methods which might comport with constitutional due process guarantees. Indeed, not only does the State encourage adoption of this patently unfair procedure, it insulates the garageman from civil or criminal liability arising out of the sale and requires one of its agencies, the Department of Motor Vehicles, to recognize and record the transfer of title (see Vehicle and Traffic Law, § 401), thus enabling the garageman to transfer title to a vehicle he would not otherwise be deemed to own (Adams v Department of Motor Vehicles, 11 Cal 3d 146, 150-151; cf. Caesar v Kiser, 387 F Supp 645; Barber v Rader, 350 F Supp 183; Dielen v Levine, 344 F Supp 823).
Even more fundamentally, the underlying purpose of the sale provisions of the Lien Law — that of conflict resolution— has always been deemed one of the essential attributes of sovereignty. Absent consent of the debtor, the power to fashion the means to order legally binding surrenders of property has always been exclusively vested in the State. Implementation of dispute settlement, irrespective of the strength of the competing interests of the parties, is the function of the judiciary, and is not dependent "on custom or the will of strategically placed individuals, but on the common-law model” (Boddie v Connecticut, 401 US 371, 375). But by permitting the possessory lienor to take those steps necessary to foreclose his lien in a nonjudicial setting where the power of sale is premised on possession alone, the State has permitted the garageman to arrogate to himself the exclusive power of the sovereign to resolve disputes. However strong the interest of the garageman in the vehicle may be, his power of foreclosure has no vitality until it is sanctioned by the State. It follows, then, that such a person vested by the State with the power to resolve unilaterally an otherwise judicially cognizable controversy, is nothing more than a delegate of an exclusively governmental function (cf. North Ga. Finishing v Di-Chem, 419 US 601, supra; Fuentes v Shevin, 407 US 67, 93, supra). For this reason, the debtor must be provided with that measure of due process as would be afforded in a court of law.
Additionally, as we held in Blye v Globe-Wernicke Realty Co. (33 NY2d 15, 20), the execution of a lien, the sale of the property affected thereby and the conclusiveness of the sale, has endowed private individuals with the same authority as has been traditionally vested with the Sheriff. This grant of *163 power to a private individual to perform a public function is attributable to the State in these circumstances[3] (cf. Parks v "Mr. Ford”, 556 F2d 132, 141; Hall v Garson, 430 F2d 430, 439; Ann., 64 ALR3d 814). The instant sale was made under the provisions of the Lien Law, the absence of which would have required Dell to go into court to prove both the validity of its lien and the charges due thereunder. Instead, by permitting the garageman to hold the sale ex parte, "the state has delegated the traditional roles of judge, jury and sheriff to [Dell] without providing for any judicial supervision or other safeguards” (Cox Bakeries of N. D. v Timm Moving & Stor., 554 F2d 356, 358).
 Having determined that enforcement of the garage-man’s lien constitutes meaningful State participation inasmuch as New York has delegated to private parties functions traditionally associated with sovereignty, we therefore reach the substantive constitutional question. Fundamental notions of procedural due process require that before the State may deprive a person of a significant property interest in aid of a creditor, that person be given notice and an opportunity to be heard prior to deprivation of that interest (Wynehamer v People, 13 NY 378, 392-393, supra; Stuart v Palmer, 74 NY 183, 191, supra; Memphis Light, Gas & Water Div. v Craft, 436 US 1; Armstrong v Manzo, 380 US 545, 552). Tested by this requirement, the statutes[4] do not pass muster *164 in light of the due process standards articulated in analogous circumstances by the Supreme Court.[5] Sniadach v Family Fin. Corp. (395 US 337, supra) and Fuentes v Shevin (407 US 67, supra) teach that even a temporary deprivation of property is entitled to due process protection. Although the implications of these holdings were left somewhat in doubt after Mitchell v Grant Co. (416 US 600), in North Ga. Finishing v Di-Chem (419 US 601, supra), the Supreme Court made clear that it was the peculiar features of the Louisiana sequestration statutes that insulated them from due process infirmity. Viewed in this context, enforcement of the garageman’s lien is as objectionable as the remedies struck down in Sniadach, Fuentes and North Ga. Finishing because it is executed without even a modicum of judicial intervention or supervision.
Moreover, the statutes challenged here display none of the "saving characteristics” (North Ga. Finishing v Di-Chem, supra, at p 607) of the provisions sustained in Mitchell. Twenty-four days after notice of sale is served, the garageman may proceed with the sale without having even approached a court or consulted the debtor, without filing a bond or affidavit, and without affording the owner a hearing in which he may contest the amount due. Even more objectionable is the fact that the statutes at issue here result in a permanent deprivation of what is today a necessity of life, not a temporary deprivation as would be occasioned by attachment, sequestration or replevin.
*165 While the owner of a vehicle ordinarily understands that a garageman expects payment upon completion of the work, the contested provisions of the Lien Law afford him little redress to the garageman’s retention and ex parte sale if the charges demanded exceed the previous estimate or there is a dispute as to the quality of workmanship. Instead, pursuant to his statutory grant of authority, a garageman may sell any vehicle, no matter how valuable, to satisfy any lien, no matter how small (Parks v "Mr. Ford”, 556 F2d 132, 143, supra). To be sure, it is a reasonable exercise of the State’s police power to give the garageman a security interest in vehicles which he has enhanced in value. However, it is unreasonable and constitutionally impermissible to provide absolutely no safeguards against unauthorized or unnecessary repairs or storage charges which may underlie the whole transaction, especially where an ownership interest hangs in the balance. By permitting a creditor to hold and sell a debtor’s property unless his demands are met, the State empowers the garageman to engage in conduct which is tantamount to blackmail. In these circumstances, it is essential that the debtor be provided a forum to air his defenses.
Notwithstanding these patent inequities, it is urged that the vehicle owner may still enjoin an impending sale (CPLR art 63), maintain an action for a judgment declaring the charges imposed unreasonable (CPLR 3001) or initiate a replevin action to recover the vehicle (CPLR art 71; see Dininny v Reavis, 100 Misc 316, affd 178 App Div 922). However, when viewed from the standpoint of the persons involved this suggestion borders on the ludicrous (cf. Matter of B. T. Prods. v Barr, 44 NY2d 226, 233, n 2). Not only does it ask us to adopt a holding specifically rejected by the Supreme Court (Fuentes v Shevin, 407 US 67, 83, and n 13, supra), it fails to take into account the delays and uncertainties inherent in any judicial proceeding and the fact that one whose automobile is subject to an impending sale is frequently poor, unrepresented by an attorney and unschooled in legal niceties. Moreover, as replevin and injunction are extraordinary remedies, they lack the certainty necessary to insure a hearing prior to permanent deprivation (see Caesar v Kiser, 387 F Supp 645, 649, supra). Even assuming that these procedures could be deemed effective, the creditor’s duty to afford the debtor an opportunity to be heard prior to the deprivation of a significant property interest would not be abrogated. The point is that by *166 requiring a hearing prior to sale there would be assurance that all will have the opportunity to assert their claims.
 Nor may the summary sale here be justified on the ground that the initial retention of the vehicle arose out of a voluntary transaction. At most, voluntary delivery of the automobile created a bailor-bailee relationship, which relationship could not divest the bailor of his continuing interest and title, irrespective of whether the bailee has a possessory lien on the bailed chattel (Hernandez v European Auto Collision, 487 F2d 378, 385 [concurring opn]). Since that possessory lien is merely a security interest, the State may not constitutionally permit a garageman to extinguish the owner’s interest without adherence to minimum due process standards. To be rejected also is the assertion that the statutes here may be justified because of the extraordinary circumstances present.[6] The property of a debtor may be summarily seized or sold only in a truly unusual situation and only "to secure an important governmental or general public interest or where the need for prompt action is paramount” (Blye v Globe-Wernicke Realty Co., 33 NY2d 15, 21, supra). But, as the Supreme Court has noted, where "no more than private gain is directly at stake” (Fuentes v Shevin, supra, at p 92), the opportunity to be heard is an indispensable bulwark against an arbitrary, and final, deprivation of property.
It must be concluded, therefore, that the sale provisions of sections 200, 201, 202 and 204 of the Lien Law violate the due process clause of the New York Constitution inasmuch as they fail to provide the owner of a vehicle an opportunity to be heard prior to permanent deprivation of a significant property interest. The garageman’s right to retain his possessory lien is unaffected by this decision, but he may not sell the vehicle to satisfy his claim unless and until a method is *167 devised, consistent with due process, of affording the owner some opportunity to be heard.[7]
Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.

. In the series of cases in which the Supreme Court has imposed the requirements of procedural due process in situations in which a creditor sought to deprive a debtor of a significant property interest (Sniadach v Family Fin. Corp., 395 US 337; Fuentes v Shevin, 407 US 67; Mitchell v Grant Co., 416 US 600; North Ga. Finishing v Di-Chem, 419 US 601), State action was manifest since the seizure was effected by officers of the State or by judicial process. In contrast, here the involvement of the State is concededly less direct (see Burke & Reber, State Action, Congressional Power and Creditors’ Rights: An Essay on the Fourteenth Amendment, 47 S Cal L Rev 1, 53; Note, Procedural Due Process — Post-Fuentes Constitutionality of Garagemen’s Liens, 54 BU L Rev 542, 550-551).

.There are, of course, substantial differences between the private sale of goods authorized by the warehouseman’s lien law and the private sale authorized by sections 200, 201, 202 and 204 of the Lien Law. Critical to the determination in Flagg Bros, that the private sale did not constitute State action was the "total absence of overt official involvement” (436 US, at p 157). Here, that overt governmental involvement absent in Flagg Bros, is present to some degree. In this State, title to an automobile cannot be transferred, and thus a sale cannot be accomplished under the Lien Law, without registration of the vehicle by the Department of Motor Vehicles and its issuance of a certificate of title (Vehicle and Traffic Law, §§ 401, 420, 2104, 2107, 2113-2115, 2117). Thus, the fact that initiation of the sale stems from a private source does not detract from the necessity that the garageman invoke both the power of the sovereign and the participation of public officials to bring about the involuntary transfer of title. The power of the State utilized to implement the involuntary transfer of title pursuant to the Lien Law may be sufficiently analogous to the issuance of a writ by a court clerk in Sniadach v Family Fin. Corp. (395 US 337), Fuentes v Shevin (407 US 67) and North Ga. Finishing v Di-Chem (419 US 601) to support a finding of overt State involvement in the garagemen’s sale. However, in view of our determination that the challenged provisions of the Lien Law are violative of the due process clause of the State Constitution, it is unnecessary for us to decide that question.

.It is true, as the Attorney-General and others have suggested, that the facts in Blye are distinguishable from those involved here. Blye involved the constitutionality of New York’s innkeeper’s lien (Lien Law, § 181), which permitted the summary seizure of the property of a guest. In contrast, the possessory lien of a garageman (Lien Law, § 184), arises out of a voluntary bailment by the owner of the vehicle, and in any event is not in issue here. Whatever the relative interests of the garageman or the innkeeper might be, the fact remains that whether the debtor’s property is summarily seized or is sold ex parte, the individual doing so is performing the traditional functions of the Sheriff and his actions are attributable to the State for purpose of section 6 of article I of the New York Constitution.

.The statutory scheme relating to the garageman’s lien and its foreclosure is relatively simple. Section 184 of the Lien Law grants a garageman a possessory lien against a motor vehicle for charges incurred in connection with its maintenance, repair or storage. The constitutionality of the possessory lien was upheld by the Appellate Division in IDS Leasing Corp. v Hansa Jet Corp. (51 AD2d 536, affg 82 Misc 2d 741), and is not in issue here. Section 200 of the Lien Law permits the possessory lien of the garageman to be satisfied by the ex parte sale of the vehicle. Section 201 provides that prior to the sale of the vehicle, the garageman shall serve a notice of sale upon the owner. Section 202 specifies that the sale of the vehicle take place at a previously advertised public auction. Finally, section 204 provides that the garageman shall retain an amount sufficient to satisfy his lien and the expenses incurred in *164 connection with the sale from the proceeds; any balance remaining to be held by the garageman subject to the demand of the now-former owner of the vehicle.

.In reaching this conclusion, we do not write on a clean slate. A significant number of courts have reached and decided the merits of procedural due process challenges to garageman’s lien foreclosure acts, striking down statutes virtually indistinguishable from those at issue here (see Parks v "Mr. Ford", 556 F2d 132; Hernandez v European Auto Collision, 487 F2d 378; Caesar v Kiser, 387 F Supp 645; Mason v Garris, 360 F Supp 420, mod 364 F Supp 452; Straley v Gassaway Motor Co., 359 F Supp 902; Cockerel v Caldwell, 378 F Supp 491; Ford v Dean’s O.K. Tire Store, CCH Poverty L Rep, par 16,856; Adams v Department of Motor Vehicles, 11 Cal 3d 146, supra; Whitmore v New Jersey Div. of Motor Vehicles, 137 NJ Super 492; Ann., 64 ALR3d 814; cf. Blye v Globe-Wernicke Realty Co., 33 NY2d 15, supra; Cox Bakeries of N. D. v Timm Moving & Stor., 554 F2d 356, supra; Culbertson v Leland, 528 F2d 426; Johnson v Riverside Hotel, 399 F Supp 1138; Ragin v Schwartz, 393 F Supp 152; Isbel v County of Sonoma, 21 Cal 3d 61; Barry Props. v Frick Bros. Roofing Co., 277 Md 15). Although the holdings of a number of the Federal cases cited above have been undermined by the "State action” determination of the Supreme Court in Flagg Bros. v Brooks (436 US 149, supra), their substantive determinations remain unimpaired, viz., that ex parte foreclosure of an artisan’s lien is constitutionally infirm inasmuch as it affords no opportunity to be heard prior to the final deprivation of a significant property interest.

.We are not unmindful of the stake that a garageman has in the prompt enforceability of his lien. However, this interest should not be deemed inconsistent with the vehicle owner’s right to be afforded the opportunity for some sort of prior judicial determination of the existence and scope of the lien. In this regard, we do not pass on the form of the hearing which the due process clause requires (see Friendly, Some Kind of Hearing, 123 U of Pa L Rev 1267, 1275). As the Supreme Court has aptly noted, "we deal here only with the right to an opportunity to be heard. Since the issues and facts decisive of rights * * * may very often be quite simple, there is a likelihood that many defendants would forgo their opportunity, sensing the futility of the exercise in the particular case. And, of course, no hearing need be held unless the defendant, having received notice of his opportunity, takes advantage of it” (Fuentes v Shevin, supra, at pp 92-93, n 29).

.There are a number of statements in the dissenting opinion which merit comment. Most importantly, we do not hold or even intimate that the statutes at issue here are not violative of the due process clause of the Federal Constitution (dissenting opn, at p 168). Rather, when tested by the dictates of the State due process clause, the statutes fail to pass constitutional muster thus rendering any inquiry of State action for purposes of the Fourteenth Amendment wholly academic (at pp 158-160, and n 2). Noticeably, the dissenters do not address the issue of whether the deprivation of a motor vehicle under the questioned statutes accords with fundamental concepts of justice and fairness.
Also disturbing is the dissent’s suggestion that our holding is afflicted with "hasty embrace” or "novelty” or of a single State court (dissenting opn, at p 168). This is so, especially in view of the number of well-respected courts of other jurisdictions, notably those of commercially active States such as California and New Jersey, which have struck down statutes similar to those in issue here (see n 5, supra). This case was argued over two months ago and the subject has been before courts for years (see Ann., 64 ALR3d 814).
Moreover, it is difficult, if not impossible, to imagine that the lengthy list of horribles posed by the dissenters (dissenting opn, at p 172), will relegate the economy of this State into a Brobdingnagian "quagmire”. For all that appears, no disastrous aftermath followed in those States whose courts saw fit to invalidate similar statutes. Even assuming that the dire consequences which so alarm the dissenters could somehow come to pass, to exalt economic considerations over the rights of our citizens is nothing more than abdication of this court’s constitutional responsibility (cf. Brooklyn Union Gas Co. v New York State Human Rights Appeal Bd., 41 NY2d 84, 90). This is not a case involving merchants where commercial considerations might necessitate a greater degree of deference to legislative judgment (cf. Uniform Commercial Code, § 2-104). Involved here are consumers, frequently poor and unrepresented by counsel, who cannot be deemed to have forfeited their constitutional rights simply because they have engaged the services of someone in the commercial sector. We hold only that a garageman with a possessory lien on a repaired motor vehicle must afford its owner an opportunity to be heard before his ownership interest may be extinguished. The dissenters’ concerns notwithstanding, this court has yet to shirk its responsibility and deprive persons of their constitutional rights because of unwarranted fears of overburdened court calendars. Moreover, nothing prevents the garage-man from securing the owner’s knowing waiver of his opportunity for a hearing when possession is initially transferred as many artisans and merchants are wont to do.
Nor have we expressed any opinion as to the constitutionality of statutes not here in issue. It may very well be that in some instances the significance of the property interest involved does not rise to cdnstitutional proportions. However, we do not fall back from our position that where a garageman, with the blessing of the State, purports to deprive a person of an economic necessity such person be afforded an opportunity to be heard.