OPINION OF THE COURT
Titone, J.
All members of the court agree that the right to free expression is one of this Nation’s most cherished civil liberties. We differ solely on the question whether article I, § 8 of our State Constitution,[1] considered in light of both history and modern conditions, precludes the owner of a private shopping mall from enforcing a blanket no-handbilling policy and compels the owner to permit use of the mall for the distribution of leaflets opposing nuclear energy. As the court concludes that article I, § 8 only limits State action, not present here, the order of the Appellate Division should be reversed and a declaration made in defendant’s favor.
I
Smith Haven Mall, a typical suburban shopping center located in central Suffolk County, Long Island, is privately owned and operated by defendant Prudential Insurance Company of America. It consists of 97 acres, of which 85 acres are dedicated to parking facilities, and contains three major department stores and approximately 125 other stores, restaurants, and service businesses, all connected by pedestrian walkways. Each of the commercial establishments is a tenant, paying rent for the use of space.
The Mall has consistently and nondiscriminatorily prohibited all leafletting, and all types of political activities or gatherings. To maintain and foster an environment conducive to the business of its tenants, the Mall has permitted only those types of events which will generate goodwill, consumer interest, and patronage. On some occasions the Mall has permitted local officials to park mobile vans in its parking lot to offer public services such as advice to senior citizens and veterans, and blood and glaucoma tests. All such activities are conducted from within the vans, and it bears emphasis that in no circumstances does the Mall permit any kind of campaign *499 ing, petitioning or distributing of leaflets in connection with these activities.[2]
In July and August of 1980, individuals representing plaintiffs SHAD and Paumanok, organizations that oppose, through what they describe as "education and non-violent action,” the use of nuclear energy to generate electricity, including plaintiffs Glaser and Cina, came to the Mall, and, without obtaining permission from the Mall owner, proceeded to hand out leaflets opposing the use of nuclear power and encouraging people to attend various demonstrations concerning the Shore-ham Nuclear Power Plant. On both occasions, a security officer informed them of the Mall’s policy prohibiting leaflet-ting on the premises and directed them to cease doing so.
Plaintiffs then brought this action against the Mall. Their complaint alleges claims under the New York Constitution only and seeks declarative and injunctive relief compelling the Mall to permit them to distribute leaflets.
On cross motions for summary judgment, Special Term, though acknowledging that the "Mall is private property and operated for * * * commercial benefit”, held that the free speech provision contained in NY Constitution, article I, § 8 invalidated the no-handbilling policy and compelled the Mall to permit plaintiffs to distribute leaflets, subject to the imposition of "reasonable regulations concerning time, place and manner” (118 Misc 2d 841, 843, 849).
The Appellate Division affirmed by a sharply divided court. The majority elaborated on Special Term’s theme, reading the State Constitution to "require that the mall be enjoined from prohibiting the distribution of leaflets on its premises, subject only to the adoption of reasonable regulations as to the time, place and manner in which such activities may be carried out” (106 AD2d 189, 190). The dissent urged that the result could not be reached "without ignoring the history of the Bill of Rights and its purpose, and without undertaking to rewrite the Constitution” (106 AD2d, at p 205). We now reverse.
II
It is, of course, now beyond dispute that a shopping center owner’s adoption and enforcement of a blanket no-handbilling *500 policy does not infringe any rights under the First Amendment to the United States Constitution (Hudgens v NLRB, 424 US 507; Lloyd Corp. v Tanner, 407 US 551) because the actions of the owner do not constitute the State action necessary to trigger Federal constitutional protections.[3]
Plaintiffs, therefore, urge us to construe our State Constitution’s free speech provision more broadly. The linchpin of their argument is that no State action requirement exists or should exist under our State Constitution so that the free speech provision may be read as imposing an affirmative limitation on private conduct. The history of the State action requirement, traditional usage and understanding and contemporary approaches to constitutional adjudication, lead us to a contrary conclusion.
The free speech provision now found in NY Constitution, article I, § 8 was added in 1821 as part of the New York Bill of Rights, which was essentially based on the Bill of Rights contained in the United States Constitution (Chaffee, Free Speech in the United States, at 4-6; 2 Chester, Legal & Judicial History of New York, at 41, 121-122; 1 Lincoln, Constitutional History of New York, at 733-734, 739-740). The Reports of the Proceedings and Debates at the 1821 Convention plainly indicate that the New York Bill of Rights, like its Federal counterpart, was intended by its drafters to serve as a check on governmental, not private, conduct (Carter and Stone, Reports of the Proceedings and Debates of the Convention of 1821, at 163, 172). General Root, for example, explicitly directing himself to the "4th clause, respecting the liberty of speech and the press * * * said it was doubtless intended to secure the citizen as well against the arbitrary acts of the legislature, as against those of the judiciary” (id., at 167).[4]
*501 Language almost identical to article I, § 8 was inserted into the Connecticut Constitution in 1818, three years prior to New York’s Constitutional Convention in 1821 (Cologne v Westfarms Assoc., 192 Conn 48, 59-60, 469 A2d 1201, 1207). The Connecticut Supreme Court found that a "review of [its] origin discloses no evidence of any intention to vesta in those seeking to exercise such rights as free speech and petition the privilege of doing so upon property of others” (id., 192 Conn, at p 62, 469 A2d, at p 1208). Other courts have generally employed a similar approach (e.g., Pendrell v Chatham Coll., 386 F Supp 341, 344 ["Article I, section 7 of the Constitution of Pennsylvania * * * imposes a limitation upon the power of the State to interfere with freedom of the press and freedom of speech, but contains no self-executing private cause of action, express or implied”]; State v John W., 418 A2d 1097, 1101 [Me] ["Both article I, § 4 of the Maine Constitution and the first amendment of the United States Constitution protect the people against governmental encroachment on their freedom of speech”] [emphasis supplied]; see also, State v Marley, 54 Hawaii 450, 461, 509 P2d 1095, 1103; People v Sterling, 52 Ill 2d 287, 287 NE2d 711; Commonwealth v Hood, 389 Mass 581, 452 NE2d 188; Commonwealth v Noffke, 376 Mass 127, 379 NE2d 1086; Woodland v Michigan Citizens Lobby, 423 Mich 188, 378 NW2d 337; State v Felmet, 302 NC 173, 273 SE2d 708; Lenrich Assoc. v Heyda, 264 Ore 122, 504 P2d 112; Logan Val. Plaza v Amalgamated Food Employees Union, 425 Pa 382, 227 A2d 874, revd 391 US 308; United States Supreme Court reversal expressly overruled in Hudgens v NLRB, 424 US 507, supra; Western Pa. Socialist Workers 1982 Campaign v Connecticut Gen. Life Ins. Co., 335 Pa Super Ct 493, 485 A2d 1, lv granted, — Pa —, 497 A2d 607; but see, Batchelder v Allied Stores Intl., 388 Mass 83, 445 NE2d 590 [4-3 decision] [finding a State constitutional right to solicit signatures on nominating petitions under provision of State Constitution guaranteeing free and equal elections; reach of free speech provision left open]).[5]_
*502 On the two occasions that we considered the free speech claims of persons who, like the plaintiffs here, sought to engage in expressive activities on private property, we permitted private property owners to exclude such persons from their premises (People v Bush, 39 NY2d 529; Watchtower Bible & Tract Socy. v Metropolitan Life Ins. Co., 297 NY 339, cert denied 335 US 886). Indeed, in People v Bush (supra), we cited both Hudgens v NLRB (supra) and Lloyd Corp. v Tanner (supra) with approval. Thus, it is firmly established that the State and Federal constitutional guarantees of freedom of speech protect the individual against action by governmental authorities, not by private persons (see, Sunshine Book Co. v McCaffrey, 4 AD2d 643, 647; Reiter v American Legion, 189 Misc 1053, 1057, affd 273 App Div 757; cf. Under 21 v City of New York, 65 NY2d 344, 360-361; Matter of Wilson, 59 NY2d 461, 476-477).
These observations are hardly surprising. That a Bill of Rights is designed to protect individual rights against the government is standard constitutional doctrine (Cooley, Constitutional Limitations, at 36-37 [rev ed 1972]; Hand, The Bill *503 of Rights [Harvard Univ Press 1958]; Rottschaeffer, American Constitutional Law § 305 [1939]; Tribe, American Constitutional Law, at 1147, n 1), and, while the drafters of the 1821 free speech clause may not have envisioned shopping malls, there can be no question that they intended the State Constitution to govern the rights of citizens with respect to their government and not the rights of private individuals against private individuals. That intent is consistent with modern constitutional theory as well as the understanding prevalent in 1821 (see, Sharrock v Dell Buick-Cadillac, 45 NY2d 152, 160 [absence of express State action requirement does not dispense with this constitutional predicate]; Cooley, Constitutional Law ch 12, at 219 [3d ed 1898]; McLain, Constitutional Law § 205, at 294 [2d ed 1910]; Pomeroy, Constitutional Law § 230 [10th ed 1888]). Indeed, this fundamental concept concerning the reach of constitutionally guaranteed individual rights is not only deeply rooted in constitutional tradition, it is at the foundation of the very nature of a constitutional democracy.
The State action requirement, consistently recognized and reaffirmed in our decisions (see, e.g., Under 21 v City of New York, 65 NY2d 344, 360-361, supra; Matter of Wilson, 59 NY2d 461, 476-477, supra), performs a vital function. Actions of the Federal Government are limited by the Federal Constitution’s reservation to State governments of all powers not expressly granted it (see, Board of Educ. v Nyquist, 57 NY2d 27, 43, n 5). State governments are not similarly restrained (ibid.). State constitutional provisions, therefore, protect individual liberty by limiting the plenary power of the State over its citizens (see, Bellanca v State Liq. Auth., 54 NY2d 228, 235-236, cert denied 456 US 1006; Grad, State Bill of Rights in Constitutions of the United States: National and State, at 117-118 [1980]; Rankin, State Constitutions: The Bill of Rights, at 4-5). Thus, State action is a crucial foundation for both private autonomy and separation of powers (see, Tribe, American Constitutional Law, op. cit., at 1149-1151).
No one disputes that we have the power, indeed the duty, to assure that the protections provided by our State Constitution remain meaningful in light of emerging needs and changing social values (see, e.g., Bellanca v State Liq. Auth., 54 NY2d 228, supra; Cooper v Morin, 49 NY2d 69; People v Settles, 46 NY2d 154, 161; People v Isaacson, 44 NY2d 511, 519-520; People v Hobson, 39 NY2d 479). But this can never be "made an excuse for imposing the individual beliefs and philosophies *504 of the judges upon other branches of government,” for it actually "shackles progress, and breeds distrust and suspicion of the courts” (Cardozo, Nature of the Judicial Process, at 91). A State Constitution is a document defining and limiting the powers of State government, not a blueprint for the judiciary to turn what it perceives to be "desirable” social policies into law (see, Berger, "The Supreme Court as a Legislature”: A Dissent, 64 Cornell L Rev 988; Deukmejian and Thompson, All Sail and No Anchor — Judicial Review Under the California Constitution, 6 Hast Const LQ 975; Horowitz, Courts and Social Policy, at 19; Thayer, Origin and Scope of American Doctrine of Constitutional Law, 7 Harv L Rev 129, 135).
We agree with the dissent that the willingness of courts to interpret constitutional provisions in light of changing conditions has safeguarded both our Constitutions and the freedom they protect (dissenting opn, at p —). There is a profound difference, however, between interpreting constitutional provisions and dispensing with constitutional requirements. In circumstances such as these, where State action has historically been a component of the constitutional inquiry, the principled "modern” approach would not dispense with the requirement, but rather would question how it is appropriately defined given the novel context (see generally, Tribe, op. cit., at 1147-1174; Nowak-Rotunda-Young, Constitutional Law, at 497-508 [2d ed 1983]; Sharrock v Dell Buick-Cadillac, 45 NY2d 152, 160-161, supra; Dworkin, A Matter of Principle, at 386-389 [1985]; Alderwood Assoc. v Washington Envtl. Council, 96 Wn 2d 230, 247 et seq., 635 P2d 108, 118 et seq. [Dolliver, J., concurring]; Woodland v Michigan Citizens Lobby, 423 Mich 188, 378 NW2d 337, supra).[6]
It would be a "demonstration of judicial arrogation” (Montgomery v Daniels, 38 NY2d 41, 53) and it "would neither serve *505 the purposes of orderly government nor honor the role of the judiciary to lay aside standards of judicial review recently held appropriate” (Board of Educ. v Nyquist, 57 NY2d 27, 49, n 9, supra). Abrogation of a State action requirement, as urged here by plaintiffs, would have broad and mischievous consequences because it would signify "a determination by the court that it, instead of the legislature, will settle conflicting interests among citizens and that it will accomplish this by what it chooses to call a constitutional basis” (Alderwood Assoc. v Washington Envtl. Council, 96 Wn 2d 230, 250, 635 P2d 108, 119, supra [Dolliver, J., concurring]), which is then beyond legislative reach. A disciplined perception of the proper role of the judiciary, and, more specifically, discernment of the reach of the mandates of our State Constitution, precludes us from casting aside so fundamental a concept as State action in an effort to achieve what the dissent perceives as a more socially desirable result.
ra
We now turn to the question whether a shopping mall owner’s enforcement of a blanket no-handbilling policy constitutes State action within the meaning of our State Constitution. If there be no State action, our inquiries must end (see, Nowak-Rotunda-Young, Constitutional Law, op. cit., at 497).
In the context of a due process challenge to private action, we have commented that, despite its outward simplicity as a concept, State action is in fact an elusive principle not reducible to ritualistic incantations or precise formalism (see, Sharrock v Dell Buick-Cadillac, 45 NY2d 152, 158, supra [citing Burton v Wilmington Parking Auth., 365 US 715, 722]; see also, Tribe, American Constitutional Law, op. cit., at 1148-1149). The factors to be considered in determining whether it has been shown include: "the source of authority for the private action; whether the State is so entwined with the regulation of the private conduct as to constitute State activity; whether there is meaningful State participation in the activity; and whether there has been a delegation of what has traditionally been a State function to a private person (Melara v Kennedy, 541 F2d 802, 805). As the test is not simply State involvement, but rather significant State involvement, satisfaction of one of these criteria may not necessarily be determinative to a finding of State action” (Sharrock v Dell Buick-Cadillac, supra, at p 158).
*506 The relevant inquiry in this case thus becomes the degree to which the State has involved itself in the enforcement of private property rights against individuals wishing to assert their rights of free expression. If such entanglement or delegation exists, it must then be ascertained whether that entanglement or delegation is sufficient to trigger the protections of the State Constitution (Sharrock v Dell Buick-Cadillac, supra, at p 161).
Plaintiffs have not alleged, much less demonstrated, that any State action is involved here. Smith Haven Mall is not the functional equivalent of a government and its conduct is not the equivalent of governmental conduct (cf. Marsh v Alabama, 326 US 501).[7] To be sure, the shopping mall has taken on many of the attributes and functions of a public forum, as the record demonstrates, but the characterization or the use of property is immaterial to the issue of whether State action has been shown. Nor can the nature of property transform a private actor into a public one (see, Lloyd Corp. v Tanner, 407 US 551, 564-565, supra; Cologne v Westfarms Assoc., 192 Conn 48, 469 A2d 1201, supra; Lenrich Assoc. v Heyda, 264 Ore 122, 124, 504 P2d 112, 114, supra). Rather, the analysis must proceed from the other direction to show significant government participation in private conduct that limits free speech rights. This plaintiffs have failed to do.
Discussion concerning the purportedly unobstructive nature of plaintiffs’ activities, the need for inexpensive channels of communication, and the long and rich tradition of free expression in this State begs the question.[8] Such factors are irrelevant to whether State action is present and whether there has been a constitutional infringement. Since there is no State *507 action involved, the provisions of our State Constitution have no role in the resolution of a dispute between private parties.
For these reasons, the order of the Appellate Division should be reversed, with costs, defendant’s motion for summary judgment granted, plaintiffs’ motion for summary judgment denied, and a declaration made that plaintiffs have no right to distribute leaflets on the defendant’s property, contrary to defendant’s wishes.

. "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.”

. In fact, during the 1976 New York Senatorial campaign, then United States Senator James Buckley was evicted from the Mall when he attempted to campaign there.

. The Supreme Court has acknowledged that, in certain circumstances, a State may recognize broader free speech rights as a matter of State law without offending any Federally guaranteed rights enjoyed by the property owner (PruneYard Shopping Center v Robins, 447 US 74).

. General Root’s view is consistent with the history of the free speech clauses contained in American State Constitutions as traced by Professor Chaffee. He notes that, unlike their European counterparts, the free speech provisions in American Constitutions are "not merely expressions of political faith * * * Their history shows that they limit legislative action as much as any other part of the Bill of Rights” (Chaffee, Free Speech in the United States, at 4). Professor Chaffee also observes that the first clause of article I, § 8, which the dissent urges is some sort of affirmative guarantee of free expression, actually was aimed at curbing legislation concerning defamation (id., at 5, n 2, citing Reports of New York Constitutional Convention *501 of 1821, at 167, 487). Sister State courts have construed identical language in their Constitutions as a limitation on legislative power to abolish defamation actions (Note, Developments in the Law: The Interpretations of State Constitutional Rights, 95 Harv L Rev 1324, 1405-1406; see, McCall v Courier-Journal & Louisville Times Co., 623 SW2d 882, 886 [Ky], cert denied 456 US 975).

. State v Schmid (84 NJ 535, 423 A2d 615, appeal dismissed sub nom. Princeton Univ. v Schmid, 455 US 100), which did not involve a shopping *502 center, does not rest on an abandonment of a State action requirement for the court noted that its prior decisions had "observed that the State Constitution serves only to limit the sovereign power which inheres directly in the people and indirectly in their elected representatives” (84 NJ, at p 558, 423 A2d, at p 627; see also, Brown v Davis, 203 NJ Super 41, 495 A2d 900). In any event, New Jersey added its free speech provision in 1844, well after New York had done so (84 NJ, at 557-558, 423 A2d, at p 627). Thus, its analysis sheds little light on the intent of the framers of the New York Bill of Rights.
In Alderwood Assoc. v Washington Envtl. Council (96 Wn 2d 230, 635 P2d 108), a majority of the court actually rejected the abrogation of a State action requirement. Justice Dolliver, whose vote was decisive, emphatically rejected the plurality’s reasoning, finding it "both unnecessary and imprudent” (96 Wn 2d, at p 247, 635 P2d, at p 118).
The 4-3 decision of the California Supreme Court in Robins v PruneYard Shopping Center (23 Cal 3d 899, 592 P2d 341, affd 447 US 74) is hardly persuasive authority. That court, in overruling its own contrary precedent only five years old (Diamond v Bland, 11 Cal 3d 331, 521 P2d 460, cert denied 419 US 885), simply said that the California Constitution protected speech and petitioning at private shopping centers. There is not much analysis and only tangential discussion, if it can be called that, of the State action question. It is evident that the result in Robins was dictated by "the accident of a change of personalities in the Judges of [the] court”, which this court has correctly condemned as "a shallow basis for jurisprudential evolution” (People v Hobson, 39 NY2d 479, 491). Be that as it may, the California Constitution was adopted in 1849 (see, Diamond v Bland, 11 Cal 3d, at pp 337-338, 521 P2d 460, 465 [dissenting opn]) and thus similarly offers no insight on the construction of the New York Constitution.

. In Sharrock v Dell Buick-Cadillac (45 NY2d 152, 157-163), for example, we did not determine that, under the circumstances of the particular infringement, State action need not be shown. Rather, we formulated a method of determining whether governmental conduct could be inferred or discovered in a transaction that historically had been characterized as "private.” It is also instructive to note that the framers of the proposed New York State Constitution of 1967 — whose aim was to modernize the Constitution to meet changing needs and understandings — adopted a view and articulation of the free speech right that clearly included a State action requirement (see, 12 Proceedings of 1967 Constitutional Convention of the State of New York, at 3 [text of proposed free speech provision]; and see, id., vol 3, at 347-351 [debate concerning the propriety of adopting the free speech language of the First Amendment]).

. Structurally and functionally, a shopping center is very different from the "company town” in Marsh v Alabama (326 US 501, 502), which consisted of "residential buildings, streets, a system of sewers, a sewage disposal plant and a 'business block.’ ” The Mall is closed to the public after business hours and the owner does not perform "the full spectrum of municipal powers” or "[stand] in the shoes of the State” (Lloyd Corp. v Tanner, 407 US 551, 569).

. It should also be noted that whether the Mall was designed and used not merely as a commercial center, but as a social and community center as well, and whether there are meaningful alternatives for free expression, were hotly contested questions of fact, which could not be resolved by summary judgment (CPLR 3212 [b]; Lopez v Senatore, 65 NY2d 1017; Winegrad v New York Univ. Med. Center, 64 NY2d 851). The findings of the courts below on these questions, relied on by the dissent, could not be accepted by this court in the present procedural posture. For the purpose of disposition of this appeal, however, these findings are irrelevant.