Titone, J.
(dissenting). Petitioner commenced this proceeding to challenge a decision of the Public Service Commission (PSC) that allows utility companies to pass along a portion of the cost of their charitable donations to their ratepayers. His challenge is based on the claim that the decision impairs petitioner’s and other ratepayers’ Federal First Amendment rights to freedom of expression and worship by requiring them to contribute indirectly to charitable groups espousing views antithetical to their own. However we may feel about the wisdom of the PSC’s policy, we conclude that the State’s regulatory involvement in the cost pass-along that petitioner finds offensive is an insufficient basis for finding that his rights have been impaired by the actions of a governmental entity. Accordingly, we dissent and vote to reverse the Appellate Division order.
The Public Service Commission decision that is challenged here was actually made in 1970. Prior to 1970, the PSC exercised its regulatory authority over utility rates by requir *275 ing the utilities’ shareholders to absorb the cost of charitable contributions rather than passing those costs along to the consumer in the form of increased prices for utility service. The PSC rescinded this policy in 1970 and replaced it with a ruling allowing utilities to recover from ratepayers a portion of their charitable contribution costs calculated by a formula based on the individual utility’s adjusted pre-1970 level of expenditure (New York Tel. Co., case 25155, 10 NY PSC 345, 84 PUR3d 321, 349-350). This change in policy reflected the PSC’s view that charitable contributions can be a legitimate business expense that ought to be recognized as a form of overhead. In its ruling, the PSC stated that "it is not our function to screen lists of contributions, to pick out the good from the bad,” but it further noted that it was "prepared to examine carefully claims for charitable contributions” and would disallow such claims "if the amounts are excessive in total or if the donees as a group are not relevant to the civic responsibilities of the public utility” (New York Tel. Co., 10 NY PSC, at p 379, 84 PUR3d, at p 349). In accordance with this policy, the PSC, in June of 1984, approved a request by the New York Telephone Company to include in its rates to consumers part of the cost of its contributions to several thousand charitable organizations. Petitioner thereafter commenced the present CPLR article 78 proceeding, arguing that the PSC’s actions in approving the pass-along violated both the establishment and freedom of expression clauses in the First Amendment of the Federal Constitution.[1] Petitioner’s constitutional claim is based largely on the Supreme Court’s decision in Abood v Detroit Bd. of Educ. (431 US 209), in which the court held that forced indirect contributions to political groups in the form of mandatory agency-shop dues violates an employee’s right to freedom of expression. In Abood, however, the dues payments were mandated by a collective bargaining agreement between the union and a governmental employer and were enforced by that employer’s coercive power to discharge those who did not wish to participate. Thus, there was no doubt in Abood that the constitutional violation complained of was the product of State action.
Here, in contrast, the question of the State’s involvement is very much in dispute. Although petitioner insists that his *276 quarrel is solely with the policy decision of the PSC, a governmental entity, it is apparent that the real source of his aggrievement is the action of the private utility, which, through the inherently coercive power of its status as a monopoly provider, is forcing him to make indirect contributions to charities he finds objectionable.[2] Consequently, although the majority concludes otherwise, Abood is manifestly not controlling here. What is more in point is the body of case law that addresses the problem of when the actions of a private entity may fairly be said to constitute "State action.”
It is beyond question that the First and Fourteenth Amendments, upon which petitioner’s claim depends, provide "no shield against merely private conduct, however * * * wrongful” (Shelley v Kraemer, 334 US 1, 13; see, Hudgens v NLRB, 424 US 507; SHAD Alliance v Smith Haven Mall, 66 NY2d 396). Rather, those amendments protect only against those infringements of liberty that may in some sense be said to emanate from the actions of the State (see, Jackson v Metropolitan Edison Co., 419 US 345). It has been candidly acknowledged that "the question whether particular conduct is 'private,’ on the one hand, or 'state action,’ on the other, frequently admits of no easy answer” (Jackson v Metropolitan Edison Co., supra, at pp 349-350). Nonetheless, there are a number of previously applied standards that provide us with some guidance.
First, the fact that the private concern is heavily regulated by government is not alone sufficient to render the conduct of that private entity "State action” (Jackson v Metropolitan Edison Co., supra, at pp 350-353; see, Blum v Yaretsky, 457 US 991). While the actions of private concerns having these characteristics may "more readily be found to be 'state’ acts” than will the actions of others, there must still be a "sufficiently close nexus between the State and the challenged action * * * so that the action * * * may be fairly treated as that of the State itself’ (Jackson v Metropolitan Edison Co., supra, at p 351). Significantly, this "nexus” cannot be established by simply showing that the private entity provides an essential public service or has a monopoly on the market, *277 where the service in question is not one that the State would traditionally provide (id., at pp 351-353).
A sufficient nexus may be demonstrated where the private action in question was compelled or directed by the State (see, Blum v Yaretsky, supra, at pp 1004-1005; Jackson v Metropolitan Edison Co., supra, at p 457). Alternatively, "State action” may be found to exist where the State "has exercised coercive power or has provided significant encouragement” so that the private choice may be deemed to be effectively that of the State (Blum v Yaretsky, supra, at p 1004; see, Flagg Bros, v Brooks, 436 US 149, 166). What is made absolutely clear by the case law, however, is that the State’s mere acquiescence in the conduct of a regulated private entity does not transform an essentially private choice into a governmental action (Blum v Yaretsky, supra, at pp 1004-1005; Jackson v Metropolitan Edison Co., supra, at p 357; see, Montalvo v Consolidated Edison Co., 92 AD2d 389, affd on opn below 61 NY2d 810).
In this case, petitioner argues that the charitable contribution pass-along has the earmarks of State action because the combination of the State’s intensive involvement in rate-setting and the utilities’ status as franchised monopoly providers results in his having to make forced contributions under the State’s sponsorship. In this respect, however, petitioner’s argument is no different in substance from that made by the dissenters and explicitly rejected by the majority in Jackson v Metropolitan Edison Co. (supra, at pp 351-352, 360-364 [Douglas, J., dissenting], at pp 366-373 [Marshall, J., dissenting]). Indeed, the majority’s conclusion that "the combined effect of the utility’s monopoly status and the rate order is no less coercive than the threat of employment loss in Abood” is virtually indistinguishable from Justice Douglas’ argument that State action should be found to exist because "in the aggregate” such factors as Metropolitan Edison’s State-authorized monopoly, its unilateral control over an essential public service and the "framework of extensive state supervision and control” warranted that conclusion (id., at pp 361-362 [Douglas, J., dissenting]). While it is true that, as a practical matter, the utilities’ monopolistic status gives them a power to coerce that is equal in some respects to the coercive power of government, that circumstance alone does not transform what has traditionally been a private activity into a governmental one. Accordingly, although the coercion present in Abood is analogous to the coercion present here, the fact remains that in this *278 case, unlike in Abood, the coercion is an unfortunate byproduct of private, not State, action.
Further, the fact that the PSC plays a vital role in the rate-setting process does not render the billing practices of the utilities the equivalent of "State action.” The PSC was created by the Legislature to oversee utilities precisely because their monopoly status would otherwise enable them to engage unfettered in rate-setting and other practices inimical to the public welfare. Having undertaken to regulate utilities, however, the State did not thereby become the initiator of the utilities’ actions.
It is true that providers of gas, electric and telephone services are not permitted to charge more than the PSC permits (see, Public Service Law § 65 [1]; § 91 [1]), and once the permissible rates are established, the utilities are not free to charge their customers less (Public Service Law § 66 [12]; § 92 [2]). However, the process by which those rates are established amply demonstrates that it is the utility, and not the PSCj which is the initiator of the disputed pass-along decision. As described in the PSC’s brief, the process consists, in simplified form, of the utility’s submitting a schedule of "revenue requirements” calculated on the basis of anticipated operating expenses. The PSC reviews these schedules and determines which items of projected expenses should be disallowed. The remaining "revenue requirements” then become the basis of the rates the utilities’ customers pay. Manifestly, these are charges in which the PSC has, in the truest sense of the word, merely "acquiesced” by failing to disallow them.
When examined closely, petitioner’s claim amounts to nothing more than a contention that the State has refused to interfere with the utilities’ decisions to pass along their charitable contribution costs to their customers, the ratepayers. There is no allegation that the PSC has compelled this activity, and, indeed, there could be none. Nor can there be any colorable claim that the activity by which petitioner feels himself aggrieved is, overtly or covertly, coerced by the State, since it is virtually inconceivable that the coercive powers of the government would be necessary to induce private concerns such as the utilities involved in this case to pass along their costs rather than absorbing those costs themselves.
Indeed, the key to analysis in a case such as this is to subtract the government from the equation and then consider what the behavior of the private entity would be without any *279 governmental intervention at all. As the Supreme Court has stated, "[t]he nature of governmental regulation of private utilities is such that a utility may frequently be required by the state regulatory scheme to obtain approval for practices a business regulated in less detail would be free to institute without any approval” (Jackson v Metropolitan Edison Co., supra, at p 357). Here, if the regulatory powers of the State were not involved in the rate-setting process, utility companies, like most unregulated business concerns, would simply include in the price for their services the cost of whatever charitable donations they might choose to make.[3] By allowing these utilities to engage, to a limited extent, in a business practice that they would naturally have pursued if there had been no State involvement at all, the PSC has done no more than merely refuse to interfere with what is essentially a private decision.[4]
To be sure, one of the motivating factors behind the PSC’s change in policy may well have been a desire to spur utilities to make charitable donations and thereby contribute to the public welfare (see, New York Tel. Co., 10 NY PSC, at pp 378-379, 84 PUR3d, at pp 349-350, supra). This underlying intention, however, does not constitute the type of "significant encouragement” that will convert the private decision at issue here into a governmental one (cf. Blum v Yaretsky, supra, at pp 1008-1009, n 19). Indeed, while the PSC may have intended to encourage private contribution, an activity which is itself unobjectionable, it has done nothing afiirmatively to encourage the utilities to pass along the attendant costs to their *280 customers. Again, that is a decision which the PSC has merely approved or, more specifically, failed to interdict.
We note in closing that there is no allegation, in either the pleadings or the papers submitted on the dismissal motion, that the PSC has actually engaged in a qualitative review of the donees the utilities select as the objects of their generosity.[5] In contrast, the PSC has asserted that it has never required utilities to make charitable contributions or to select particular organizations for the contributions they choose to make. Further, the PSC has alleged that it has never interfered with a utility’s choice of donees, although in 1970 it indicated that it might do so. Had it done so, our disagreement with the majority might not have been as acute.
In sum, it is evident that the PSC is not the source of petitioner’s grievance and, consequently, we cannot agree that his rights under the First and Fourteenth Amendments have been violated. While the PSC has the power to, and in fact has in the past, forbid the practice to which petitioner objects, its refusal to exercise its authority in that manner now does not imbue the utilities’ conduct with the characteristics of "State action.” Thus, while reasonable minds may differ as to the wisdom of the PSC’s policy of nonintervention in this area, it cannot be said that Federal constitutional rights are implicated. Inasmuch as we are bound by Supreme Court precedent in interpreting the Federal Constitution, we can reach no other conclusion than that the petitioner’s proper remedy, if remedy there should be, rests with the Legislature, which has the authority to direct the PSC in the use of its regulatory powers (see, e.g., Public Service Law § 91 [2] [b]).
Accordingly, we would reverse the order of the Appellate Division and dismiss the petition in its entirety.
Judges Meyer, Simons, Kaye and Alexander concur with Judge Hancock, Jr.; Judge Titone dissents and votes to reverse in a separate opinion in which Chief Judge Wachtler concurs.
Order affirmed, etc.

.Petitioner has not asserted any claim that his rights under our State Constitution (NY Const, art I, § 8) have been violated (compare, SHAD Alliance v Smith Haven Mall, 66 NY2d 496, with Sharrock v Dell Buick-Cadillac, 45 NY2d 152).

.Contrary to the majority’s view, that petitioner initially named the PSC and not the utility as the party defendant is of no consequence. In determining whether a claimed deprivation of a constitutional right involves an action by the State or merely a private decision, we look to the substance of the claim and not to the status of the party who has been sued (see, Blum v Yaretsky, 457 US 991, 1003).

.Contrary to the majority’s assertion (majority opn, at p 271), we do not advance the PSC’s noninvolvement in rate-setting'as a "valid proposition” that requires "support in law or fact.” Rather, we merely posit that noninvolvement hypothetically, as a means of demonstrating that, despite the majority’s suggestion to the contrary (at p 273), the utilities’ power to charge rates for their services is not derived from the PSC, but rather is a natural incident of their status as owners of those services.

.To the extent that private business concerns choose to make such donations out of their profits, it may be that they do so because of their belief that the market will not tolerate an increased price for their goods or services. Of course, utilities generally do not need to make such sensitive price calibrations, since their services are public necessities and the consumer simply cannot take his business elsewhere. Thus, to a large extent, utilities are free, in the absence of regulation, to pass along many types of business expenditures that other corporations would elect to absorb. This circumstance, however, is a by-product of utilities’ status as monopolies, and not a result of any governmental intervention.

.Although Special Term indicated that petitioner had made such allegations, our own review of the papers does not bear out this conclusion. Indeed, in the briefs petitioner submitted in response to the dismissal motion, he acknowledged that the "recipients are selected solely at the discretion of the utility” and that "it is the express policy of the PSC not to regulate or screen the contributions or their recipients.”