THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v DAVID
IRIZARRY, Defendant.

Supreme Court, Bronx County, November 7, 1988

[redacted]

### APPEARANCES OF COUNSEL

*Paul Gentile, District Attorney (Kenneth Bozza* of counsel), for plaintiff. *Mordkofsky, Goldstein & Weinstein (Barry Weinstein* of counsel), for defendant.

### OPINION OF THE COURT

PHYLIS SKLOOT BAMBERGER, J.

The defendant was indicted for burglary in the second degree, grand larceny in the third degree, criminal mischief in the fourth degree and harassment. During jury selection the defense requested that a mistrial be declared because the prosecutor exercised his peremptory challenges to eliminate women jurors. The motion was renewed later in the selection process. The court concluded that the defense had established a prima facie case of gender-based challenges. However, the motion for mistrial was denied because the court was satisfied that the prosecutor provided reasons independent of gender

for the challenges. This opinion sets forth the legal basis and factual findings for the decision.

## I. USE OF PEREMPTORY CHALLENGES BASED SOLELY ON GENDER IS PROHIBITED

### A. *State Prohibitions Against Gender-Based Exclusions*

■ The United States Supreme Court has not yet spoken to gender-based exclusion in the selection of the petit jury and the use of peremptory challenges. *(See, Batson v Kentucky,* 476 US 79 [1986] [dealing with peremptory challenges and racial bias]; *Duren v Missouri,* 439 US 357 [1979]; *Taylor v Louisiana,* 419 US 522 [1975] [dealing with exclusion of women from the jury panel from which the jury is selected].) Accordingly, this court first examines the State law to determine if there are independent State grounds, statutory or constitutional, for protection of the right asserted here. *(Michigan v Long,* 463 US 1032 [1983].) This court holds that State statutory and constitutional provisions relating to jury trial and the right to be a juror as well as the State Equal Protection Clause preclude use of gender-based peremptory challenges.

#### 1. THE STATE RIGHT TO A JURY AND TO THE RIGHT TO BE A JUROR

##### a. *Revisiting McGray*

In *People v McCray* (57 NY2d 542, 550 [1982], *cert denied* 461 US 961 [1983]), the Court of Appeals decided that *Taylor v Louisiana (supra)* required that distinctive community groups not be systematically excluded from the pool of prospective jurors who would constitute the venire from which the petit jury would be selected. The Court of Appeals concluded that nothing in the language of the State right to a jury trial suggested that the framers of the New York State Constitution intended a more expansive interpretation of the State right. On this rationale the Court of Appeals rejected a claim that the New York State Constitution's guarantees of a jury trial and of a judgment of one's peers prohibited use of peremptory challenges to exclude black jurors from the venire from which the petit jury was selected.

After the decision in *Batson v Kentucky (supra),* the Court of Appeals decided *People v Scott* (70 NY2d 420 [1987]). While reversing *McCray (supra)* on Federal constitutional grounds, *Scott* did not reconsider *McCray's* State constitutional hold-

ings; there was no need for it to do so. Further, neither *McCray* nor *Scott* discussed the State statutes protecting the right to a jury or the right to be a juror.

In the six years since *McCray (supra),* there has been much written by the Court of Appeals concerning the application of State constitutional law to provide protections to individuals greater or different than those accorded by the Federal Constitution. In *People v P. J. Video* (68 NY2d 296 [1986], *cert denied* 479 US 1091 [1987]), decided four years after *McCray,* the Court of Appeals wrote: "Under established principles of federalism * * * the States * * * have sovereign powers. When their courts interpret State statutes or the State Constitution the decisions of these courts are conclusive if not violative of Federal law. Although State courts may not circumscribe rights guaranteed by the Federal Constitution, they may interpret their own law to supplement or expand them." *(People v P. J. Video, supra,* 68 NY2d, at 302.) The court then set out the factors to be considered when deciding the scope of the protections provided by the New York Constitution, and whether they exceeded those of the Federal Constitution. The court referred to interpretive and noninterpretive examinations of the relevant State law.

Interpretive review is an examination of language to determine whether there is specific recognition of rights not enumerated in the Federal Constitution, and whether a broader interpretation of a right is justified. Interpretive review also includes examination of the history of the State law provision as well as of the structure of the Constitution to determine if it affirms rights or restricts the power of the State.

Noninterpretive analysis is an effort to discover the "preexisting State statutory or common law defining the scope of the individual right in question; the history and traditions of the State in its protection of the individual right; any identification of the right in the State Constitution as being one of peculiar State or local concern; and any distinctive attitudes of the State citizenry toward the definition, scope or protection of the individual right." *(People v P. J. Video, supra,* at 303; *see also, People v Alvarez,* 70 NY2d 375, 379 [1987]; *People ex rel. Arcara v Cloud Books,* 68 NY2d 553, 557 [1986].)

■ The methodology described in *P. J. Video (supra)* and *Alvarez (supra)* was used prior to the 1982 decision in *McCray (supra).* (Kaye, *Dual Constitutionalism in Practice and Principle,* 42 The Record of Assn of Bar of City of NY 285, 299-302

[1987].)[1] However, it was only occasionally articulated in the form structured in *P. J. Video*[2] to determine whether the State law provided more than the minimum level of protection provided by Federal law. Because *McCray* reviewed only the language of the State jury guarantees, after *P. J. Video* this court may appropriately reconsider the scope of the State right to a jury trial and the State right to be a juror. A reexamination should include the noninterpretive history of the jury trial in New York, one not undertaken in *McCray*.

---

1. *E.g., People v Belton* (55 NY2d 49 [1982] [search of automobile sustained under State Constitution on automobile exception to warrant requirement and not under Federal theory of search incident to an arrest]); *Bellanca v New York State Liq. Auth.* (54 NY2d 228 [1981], *cert denied* 456 US 1006 [1982] [ban on topless dancing is invalid under the express protection of NY Const, art I, § 8; the New York State provision for free expression is at least as broad as the Federal, but is not limited, as is the Federal, by the 21st Amend which allows the States to regulate liquor sales]); *People v Bartolomeo* (53 NY2d 225 [1981] [knowledge that a person in custody has counsel on other charges or that a person has been arrested on other charges requires waiver of that counsel in the presence of counsel]); *People v Skinner* (52 NY2d 24 [1980] [invocation of right to counsel prior to formal commencement of criminal action by a person not in custody precludes interrogation or waiver without counsel]); *Cooper v Morin* (49 NY2d 69 [1979], *cert denied sub nom. Lombard v Cooper,* 446 US 984 [1980] [Due Process Clause requires contact visits for pretrial detainees; due process test of balancing of rights and interests results in greater protection of the rights of detainees under State law rather than Federal law]); *People v Settles* (46 NY2d 154 [1978] [after indictment, waiver of counsel can be made only in counsel's presence; discussion of New York counsel provision]); *People v Isaacson* (44 NY2d 511 [1978] [police beating and tricking of a person to involve defendant in a police-created crime is a violation of State due process concepts]); *People v Hobson* (39 NY2d 479 [1976] [defendant in custody can waive counsel who has already represented him in the case only in the presence of counsel]); *People v Arthur* (22 NY2d 325 [1968] [involvement of any attorney who notifies police precludes questioning of the defendant without a waiver in counsel's presence]).

2. In *Sharrock v Dell Buick-Cadillac* (45 NY2d 152 [1978]), the Court of Appeals articulated the analysis that later appeared in *People v P. J. Video* (68 NY2d 296), but was not employed in *People v McCray* (57 NY2d 542). Explaining the Due Process Clause of the State Constitution, the Court of Appeals wrote: "This independent construction finds its genesis specifically in the unique language of the due process clause of the New York Constitution as well as the long history of due process protections afforded the citizens of this State and, more generally, in fundamental principles of federalism" (45 NY2d, at 159-160). The court then discussed language and historical differences in the Due Process Clauses. Of the State Constitution, the court said: "In contrast [to the Federal Due Process Clause], State Constitutions in general, and the New York Constitution in particular, have long safeguarded any threat to individual liberties, irrespective of from what quarter that peril arose." (45 NY2d, at 160.)

b. *Women and Juries in New York*

The history of the jury system in New York from 1683 through 1937 finds women precluded from being jurors. However, in 1937 a revolutionary statutory change occurred and it is this change which begins the independent development of New York law.

The NY Constitution of 1777 included both a right to a jury trial in all cases in which it was used in the colony (art XLI) and a prohibition on the denial of rights secured by the Constitution unless in accord with the law of the land or judgment of peers.[3] The history of the word "peer" as it related to the development of the jury is not precisely known, but "it did guarantee a procedure in trials, from which, it is generally agreed, eventually sprang the modern jury system as practiced under the common law of England." *(People v Dunn,* 157 NY 528, 534 [1899].)[4] Indeed, preceding the NY Constitution of 1777, the Charter of Liberties and Privileges of 1683 § 5, and the later Charter of 1691 directed "a [jury] of twelve men, and as near as may be peers or [e]quals [a]nd of the neighborhood and in the County * * * where the fact shall arise". Section 2 of the Charter required a judgment of peers and application of the law of the province. (IV Lincoln, Constitutional History of New York, at 38-39 [1906].)

The NY Constitution of 1821 continued the two provisions of the first Constitution with significant modification: sections 1 and 2 of article VII did not limit the rights protected to those set out in the 1777 Constitution. It protected all rights against denial unless by law of land or judgment of peers. The guarantees were included again in the NY Constitution of 1846 (art I, §§ 1, 2). Although the word "impartial" was not used to modify "jury" in the Constitutions, by the statute of 1829, the word "impartial" was added to the right to a jury trial.[5] The jury was expected to be impartial: "[A]ny act requiring or authorizing such trial by a jury partial and biased against either party would be a violation of one of the essential elements of the jury referred to in and secured by the Constitution. * * * The end sought by the common law

---

3. NY Const of 1777 art XIII.

4. Although used in the Magna Carta, the word peers did not apply to a jury, but only to the method of trial because the jury had not developed. *(People v Dunn,* 157 NY 528, 533-534 [1899].) However, there is no doubt of the influence of the concept on jury trials. (Holdsworth, History of English Law, at 215 [1927]; *id.,* at 386-390.)

5. Revised Statutes of New York (part I, ch IV, § 14 [1st ed 1829]).

was to secure a panel that would impartially hear the evidence and render a verdict thereon uninfluenced by any extraneous considerations whatever." *(Stokes v People,* 53 NY 164, 172 [1873].)* The two constitutional provisions, securing rights and granting a jury trial, remained in the 1894 constitutional revision as they had been in earlier Constitutions.[6]

In 1899, the Court of Appeals wrote that the Constitution secures the right to "a common-law jury of twelve men": "The right was conceded to the citizen of having the judgment of an impartial committee, or body, of his fellow-citizens, upon charges involving his life, or his liberty, or his property, and two elements became essential ingredients of the right, viz.: that the jurors should be twelve in number and that they should be capable of deciding the cause fairly and impartially." *(People v Dunn, supra,* 157 NY, at 536.) The methods for selection of a jury were to be left to the Legislature subject to the requirement of impartiality. *(Supra,* at 536.)

In 1895, by a statute entitled "An Act to protect all citizens in their civil and legal rights", the Legislature prohibited disqualification from service as a grand or petit juror based on race, creed, or color. Any person charged with any duty in the selection or summoning of jurors who excluded or failed to summon any citizen because of race, creed or color was guilty of a misdemeanor.[7] Women were still barred from being grand or petit jurors.[8] By statute of 1909, the right to an impartial jury and the prohibition on disqualification for Grand or petit jury service based on race, creed or color were included in the Civil Rights Law.[9] But the 1909 statute continued the prohibition against women jurors.[10]

In 1936, the Judicial Council of New York in its Second Report expressed concern with the deterioration of the jury caused by the numerous exemptions allowed for groups of people who were better educated and more competent than the remaining groups. Judges expressed concern about the difficulty of securing jurors who would understand the issues. Note was made of the political pressures to retain the exemp-

---

6. NY Const of 1894, art I, §§ 1, 2.

7. L 1895, ch 1042, § 3 (June 15, 1895).

8. *E.g.,* Consolidated Laws of 1907, ch 30 (Judiciary Law, art 16, § 502 [1] [counties other than New York and Kings]; art 17, § 598 [1] [New York County]; art 18, § 686 [1] [Kings County]).

9. Consolidated Laws of 1909, ch 6, §§ 12, 13, as added by L 1909, ch 14.

10. L 1909, ch 35, cited as Consolidated Laws of 1909, ch 30 (Judiciary Law § 502 [1]; § 598 [1], [3]; § 686 [1], [3]).

tions. On the issue of the prohibition of women from jury service, the Council recommended service by women under the same qualifications and exceptions as were applicable to men to increase the group available to serve as jurors.[11]

The next year a major and revolutionary change occurred. The Legislature amended Judiciary Law §§ 502, 598, and 686 to withdraw male gender as a qualification for jury service.[12] Although the statute also allowed women to seek an exemption from jury service, which if claimed was automatic,[13] the statutory change assured the right against preclusion of women as jurors. In March 1938, Civil Rights Law § 13 was amended to assure to women the right to be jurors.[14] That act precluded disqualification from Grand or petit jury service based on gender. The statute was enacted to make clear that consideration of gender as a qualification for jury duty was prohibited State-wide.[15]

By the 1937 amendment "the Legislature has introduced a fundamental change in the public policy of the State. Until that amendment and throughout our prior political history, public policy, expressed in various statutes governing the subject, had uniformly declared that women should be ineligible for jury service. In 1937 the Legislature reversed its position upon that subject by withdrawing sex as a qualifying factor." (Gerry v Volger, 252 App Div 217, 219 [4th Dept 1937]; see also, People v Shearer, 169 Misc 69, 71 [Kings County Ct 1938].) The New York courts relied on State law to condemn exclusion of women from Grand and petit juries. In People v Cosad (189 Misc 939, 939-940 [Seneca County Ct 1947]), the court referred to the 1938 statute stating "the Legislature of the State of New York decreed that women were eligible for service as grand jurors", but found no women had been included in the jury list or had served. The court found a violation of the defendant's constitutional rights, citing Gerry, Shearer and, significantly, Ballard v United States (329 US

11. Second Report of Judicial Council of State of New York, at 87, 94 (Albany 1936).

12. L 1937, ch 513 (eff Sept. 1, 1937).

13. Judiciary Law § 546 (7) (counties other than New York and Kings); § 635 (7) (New York County); § 720 (7) (Kings County). These sections were repealed, reenacted and renumbered by later statutes. By L 1940, ch 202, § 1, Judiciary Law former §§ 635 and 720 became § 599. By L 1954, ch 305, § 1, Judiciary Law former § 546 became § 665.

14. L 1938, ch 163, § 1.

15. L 1938, ch 163, n *.

187 [1946]). Reliance on *Ballard* was significant because, as a decision under judicial supervisory powers (329 US, at 193; *see, Peters v Kiff,* 407 US 493, 500, n 9 [1972]), it was not binding on State courts. Nevertheless, *Cosad,* recognizing the importance of the new legislation, adopted *Ballard* to explain the significance of ending improper exclusion of women. *Ballard* said: "the two sexes are not fungible; a community made up exclusively of one is different from a community composed of both; the subtle interplay of influence one on the other is among the imponderables." (329 US, at 193; *see also, People v Attica Bros.,* 79 Misc 2d 492, 493, 498 [Sup Ct, Erie County 1974]; *People v Cender,* 67 Misc 2d 129, 132 [Sup Ct, Queens County 1971].)

Significantly, a Committee of the Constitutional Convention of 1938 stated that these statutory changes were not required by the State Constitution and were possible of reversal by the Legislature. Rather, it expressed the view that the jury was a significant political institution, that the exclusion of women eliminated the perspective of a great proportion of the population and that such exclusion was inconsistent with democratization of the law.[16]

Our history unequivocally establishes that since 1937 the New York Legislature's policy was to eliminate preclusion of women's participation on Grand and petit juries. Application of the noninterpretive analysis required by *P. J. Video* (68 NY2d 296, *supra)* provides a particular and specific New York effort against exclusion of women jurors. Therefore, the restrictive view of New York law applied in *McCray* (57 NY2d 542, *supra)* is no longer viable after the *P. J. Video* analysis.

The development of the State right not to have women excluded as jurors and the right of women to be jurors makes it unnecessary to rely on Federal authorities to prohibit exclusion of women from jury participation based solely on gender. The Federal constitutional prohibition on discrimination against women developed later, was based on different origins and evolved from the judiciary. The first case binding on the States prohibiting the discrimination against women was *Taylor v Louisiana* (419 US 522, *supra),* decided in 1975, years after the 1937 New York statute. *Taylor's* origins were in several post-1938 Supreme Court the decisions. In 1940, *Smith v Texas* (311 US 128), an equal protection race case,

16. NY State Constitutional Convention Comm, 1938, vol VI, *Problems Relating to Bill of Rights and General Welfare,* at 18.

stated that a jury should be representative of the community. In 1942, *Glasser v United States* (315 US 60, 85-86), a Federal supervisory nonconstitutional decision, the court again held the jury was to represent the community. In 1946, *Thiel v Southern Pac. Co.* (328 US 217) and *Ballard v United States* (329 US 187, *supra*), both Federal supervisory nonconstitutional cases, held the jury had to be drawn from a fair cross section of the community. *Ballard* specifically applied to women. In 1968, *Duncan v Louisiana* (391 US 145) applied the Sixth Amendment right to a jury trial to the States. The application of the cross-section principle to women came with *Taylor* in 1975. *(See, Taylor v Louisiana, 419 US, at 542 [1975].)*[17]

Even post-1975 events bear witness to the independent approach of the State Legislature. In 1975, the Judiciary Law was amended to remove the permissive exemption from jury duty based on female gender.[18] The statute was signed on February 5, 1975, within days after *Taylor v Louisiana (supra)* was decided. The Office of Court Administration, noting that it was the New York courts which would be required to decided whether *Taylor* affected the women's exemption, urged the Legislature to repeal the exemption as a matter of public policy and to eliminate uncertainty. The Governor's message, without waiting for judicial application of *Taylor,* took the position that the statute discussed in *Taylor* and the New York women's exemption were basically similar and incorrectly predicted that there was no doubt that the New York provisions would be held unconstitutional under *Taylor.*[19] The

17. There were a few early State precedents that used the cross-section analysis. Some linked the cross-section analysis to the Equal Protection Clauses. In 1949, Judge Fuld wrote: "Traditional in our jury system is the concept that the jury, petit or grand, be a democratic and representative body drawn impartially from a cross section of the community to assure that it reflects the interests and viewpoints of all races, classes and groups." *(People v Dessaure,* 299 NY 126, 133 [dissenting opn].) The opinion cites equal protection cases. *(See also, People v Henry,* 55 Misc 2d 134, 137 [Dutchess County Ct 1967]; *People v Marr,* 67 Misc 2d 113, 119 [Justice Ct, Albany County 1971].) However, these cases did not provide the doctrinal basis for State law development.

18. L 1975, ch 4, § 1, repealing Judiciary Law § 507 (7); § 3 repealing Judiciary Law § 599 (7); § 6 repealing Judiciary Law § 665 (7).

19. 1975 NY Legis Ann, at 6. The 1975 statute reflected the legislative and executive concern for improper exclusion of women for juries simply because of the women's exclusion. On the other hand, the courts, with one exception *(see, People v Moss,* 80 Misc 2d 633 [Sup Ct, Kings County 1975]), did not believe *Taylor v Louisiana* (419 US 522) meant the exemption was

Governor chose not to wait for judicial application of *Taylor,* but to authorize immediate impaneling of proper juries by repeal of the exemption.[20]

The Office of Court Administration also supported the enacted legislation to supplement temporarily the methods of selecting and impaneling jury panels to allow replenishment of county jury lists with jurors chosen without regard to the women's exemption.[21] The Governor's message on this legislation similarly emphasized the need to correct county jury lists and panels and increase the number of women where they were substantially disproportionate to the number of women in the community.[22] Finally, in lieu of the women's exemption the Legislature enacted a non-gender-based parental exemption for people caring for children under 16 years of age.[23] This legislation was said by Senator Gordon to achieve a greater participation of the citizenry in jury duty while recognizing family responsibilities.[24]

In 1977, the Judiciary Law provisions for jury selection were amended again, this time to effect a major restructuring of procedures.[25] As amended, Judiciary Law § 500 states: "It is the policy of this state that all litigants in the courts of this state entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross-section of the community in the county or other governmental subdivision wherein the court convenes; and that all eligible citizens shall have the opportunity to serve on grand and petit juries in the courts of this state, and shall have an obligation to serve when summoned for that purpose, unless exempted, disqualified or

---

unconstitutional. Rather, they examined the circumstances to see if the exemption resulted in systematic or intentional exclusion of women. *(See, e.g., People v Davila,* 59 AD2d 536 [2d Dept 1977]; *People v Chesler,* 91 Misc 2d 551 [Sup Ct, Monroe County 1977]; *People v Kessler,* 81 Misc 2d 492 [Dutchess County Ct 1975].) That was the standard previously applied to evaluate claims of improper exclusion from the panel or Grand Jury. *(People v Chestnut,* 26 NY2d 481 [1970]; *People v Horton,* 18 NY2d 355 [1966], *cert denied* 387 US 934 [1967]; *People v Agron,* 10 NY2d 130.)

20. 1975 McKinney's Session Laws of NY, at 1731.

21. 1975 NY Legis Ann, at 7; L 1975, ch 21.

22. 1975 NY Legis Ann, at 413; 1975 McKinney's Session Laws of NY, at 1733.

23. L 1975, ch 382. The history of the 1977 statute (L 1977, ch 316) that completely restructured the juror selection process would imply that the child care exemption was originated with that statute. It was, however, enacted in 1975.

24. 1975 NY Legis Ann, at 55.

25. L 1977, ch 316; 1977 McKinney's Session Laws of NY, at 2617.

excused." The statute broadly defined those who were qualified to serve as jurors (Judiciary Law § 510) and maintained the child-care exemption (Judiciary Law § 512 [7]). The memorandum of the Office of Court Administration accompanying the bill explains that the statute is to meet all the constitutional requirements that juries represent a fair cross section of the community and guarantee that all eligible citizens shall have the opportunity to serve as grand and petit jurors.[26]

Although the 1975 and 1977 statutory amendments were related to the Federal gender-exclusion prohibition pronounced in *Taylor (supra),* the passage of those amendments was rooted in our State statutory history between 1937 and 1977, expressing a broad public and political policy in favor of inclusion of women on juries and of preventing gender-based exclusion.

### c. *Application of State Statutes to Selection of the Petit Jury*

■ This court concludes that the history of the State prohibition on gender-based conduct in jury selection is not limited to selection of the jury pool, but extends to selection of the jury from that pool. The 1937, 1938, and 1977 statutes are not limited by their language, intent or legislative history to membership in the jury pool or on the jury panel. To the contrary, these factors include the petit jury itself. If the jury clerk deliberately sent a panel of all men or all women to a courtroom for the selection of the petit jury, such conduct would be just as unlawful as the selection of the pool by gender-based exclusion. It must follow that deliberate use by the prosecutor of peremptory challenges to eliminate jurors based on gender is also unlawful under these statutes. The effect of such conduct will be to wrongfully eliminate the opportunity to have women (or men) on the jury. "The requirement of a fair cross section of the community would be meaningless if the jury pool were representative of the community, but there were no fair possibility that the petit jury would be representative of the community." *(People v Muriale,* 138 Misc 2d 1056, 1065 [Sup Ct, Kings County 1988]; *see also, People v Thompson,* 79 AD2d 87, 102-103 [2d Dept 1981], *appeal withdrawn* 55 NY2d 879 [1982]; *see,* for its reasoning, as quoted *infra,* at 813–814, *McCray v Abrams,* 750 F2d 1113, 1128 [2d Cir 1984], *vacated and remanded* 478 US 1001 [1986],

---

26. 1977 McKinney's Session Laws of NY, at 2617; 1977 NY Legis Ann, at 147-148.

*appeal dismissed* docket No. 84-2026 [2d Cir, Oct. 23, 1986], *reaffirmed in Roman v Abrams,* 822 F2d 214, 226 [2d Cir 1987], *cert pending* docket No. 87-6031 [1987].)

The single argument in opposition to the application of these principles to petit jury selection is the State authorization of peremptory challenges. The legislative power to promulgate the laws concerning selection of an impartial jury *(Stokes v People,* 53 NY 164, 173, *supra; People v Dunn,* 157 NY 528, 535, *supra)* includes the right to grant, restrict and eliminate peremptory challenges. *(Walter v People,* 32 NY 147 [1865], cited in *People v Dunn,* 157 NY, at 535.) The history of peremptory challenges in New York is set out in *People v Thompson (supra,* 79 AD2d, at 98). Briefly, no challenges were allowed to the People between 1786 and 1858. In 1858 (L 1858, ch 332) the People were allowed 5 peremptory challenges for crimes involving punishment of death or 10 or more years' imprisonment, and 3 peremptories for other crimes. In 1873, the number granted the State was made equal to that given the defense. (L 1873, ch 427.)

 Principles of statutory construction require a reconciliation between the 1873 statute providing for peremptory challenges and the 1937, 1938, and 1977 statutes which make otherwise qualified citizens and residents eligible to be jurors whatever their sex, and give every defendant a right against gender-based exclusion of people from his or her jury. Prior to 1937 there was no conflict between the use of peremptory challenges and challenges based on gender. Only after the 1937 and 1938 statutes did a conflict arise. The fundamental change in public policy reflected by the legislation requires either that the peremptory challenge statute be held to have been repealed or that it be reinterpreted to limit peremptory challenges.

"Whether one statute repeals another is largely a question of legislative intent. The lawmakers may indicate this intent by expressly stating that a designated prior statute is repealed. However, this practice is not essential to effect the repeal. The latest constitutional declaration by the Legislature constitutes the law, and though the act contains no express repealing clause all prior acts are thereby impliedly repealed so far as they are in conflict. In other words, conflict between statutory provisions must be resolved by holding that the later statute impliedly repealed the earlier one insofar as they are inconsistent, with the result that the later one is controlling."

(McKinney's Cons Laws of NY, Book 1, Statutes § 391, at 552-553 [1971].)

This court does not believe the Legislature intended to do away with peremptory challenges when it ended gender-based discrimination in jury selection. This court must reconcile the statutes to give effect to the legislative intent to the extent possible with the later one controlling. *(Abate v Mundt,* 25 NY2d 309, 318 [1969]; *Matter of Public Serv. Commn. v Village of Freeport,* 110 AD2d 704, 705 [2d Dept 1985].) Accordingly, peremptory challenges must be used in a manner consistent with later legislation precluding exclusion of women based solely on gender. This court finds that under New York statutes, peremptory challenges cannot be used to exclude jurors based solely on gender.

### d. *State Constitutional Protections*

■ The decision of *McCray* (57 NY2d 542, *supra)* that the State constitutional protection did not provide greater rights than the Federal Constitution did not analyze State statutes and traditions as *P. J. Video* (68 NY2d 296, *supra)* now requires. After the *P. J. Video* analysis, this court not only holds that the statutes discussed above protect against the exclusion of women from juries based solely on gender, but that the State constitutional provisions do so as well. (NY Const, art I, §§ 1, 2, 6; art VI, § 18.) The policies and efforts against improper treatment of women in our court system have been widely proclaimed. In 1984, then Chief Judge Lawrence Cooke announced formation of the New York Task Force on Women in the Courts and stated:

"To deny anyone anything because of race, creed, color, national origin, gender or any such irrelevant consideration is the basest kind of misbehavior. It is a surrender of the human * * * instincts.

"Distinctions grounded on improper concerns have no place whatsoever in the operation of our legal system and every reasonable effort should be made to guarantee that the scales of justice are balanced evenly for every person who comes before the courts. They expect no less and, certainly, are entitled to no less. There must be no corridors of special privilege, high hurdles for some, or bans on any. There must be no institutional hypocrisy." (Report to NY Task Force on Women in Courts [Task Force Report], exhibit A, at 1 [Mar. 1986].)

The aim of the Task Force was to promote equality for men

and women in the courts, to identify gender bias and find ways to end that bias, and to ascertain whether statutes, rules, practices or conduct work unfairly against women. (Exhibit A, at 2.)

In its March 1986 report, the Task Force wrote of efforts needed to overcome "the problems women face—rooted in a web of prejudice, circumstance, privilege, custom, misinformation, and indifference—[which] affect women of every age, race, religion, and economic status". The Task Force underscored that "real hardships are borne by women" and that "an exacting price is ultimately paid by our entire society. The courts are viewed by a substantial group of our citizenry as a male-dominated institution disposed to discriminate against persons who are not part of its traditional constituency." (Task Force Report, at 6.) The Report noted that statutes placed women on an equal footing with men, but urged Judges and others to make the laws effective. (Id., at 5.) "Active leadership by New York's judicial hierarchy that makes clear that gender-based discrimination in the courts will not be tolerated is * * * indispensible." (Task Force Report, at 7.)

Chief Judge Sol Wachtler, in a speech on May 1, 1986, said that "It has been the abiding objective of this administration to provide to all citizens a court system that delivers quality justice. Making abundantly clear that gender biased conduct is wrong wherever found in New York's Courts—inimical to any concept of justice—is an important step towards that end." (Report of Comm to Implement Recommendations of NY State Task Force on Women in Courts, Appendix B [Apr. 1987].)

The statutes enacted by our Legislature as representatives of our citizenry, the broad membership of the Task Force and the Implementation Committee, and the unequivocal language of our Judges make it clear that gender-based discrimination to preclude jury membership by any means is intolerable and a violation of contemporary standards of fairness, justice and decency. The Legislature could not today authorize preclusion of women from jury duty based on gender. Current judicial and legislative attitude, as reflected in Judiciary Law § 500, constitutionalizes the prohibition of gender-based choices with which we are concerned here.

e. *Cross Challenges*

Under State law a defendant of one group can challenge

exclusion of a juror in another protected group. *(People v Guzman,* 60 NY2d 403, 409, n 2 [1983], *cert denied* 466 US 951 [1984]; *Matter of Alessi v Nadjari,* 47 AD2d 189 [1st Dept 1975].)* Therefore, the defendant here can challenge exclusion of women.

## 2. STATE EQUAL PROTECTION CLAUSE

█ The Court of Appeals has determined that the State Equal Protection Clause (NY Const, art I, § 11) provides the same protections as the Federal clause. *(People v McCray, supra,* 57 NY2d 542, 550; *Matter of Esler v Walters,* 56 NY2d 306, 314 [1982].)* Reading *Batson* (476 US 79, *supra)* together with the precedents, both Federal and State, restricting gender-based discrimination under Equal Protection Clauses, the use of peremptories cannot withstand challenge.[27]

Gender-based conduct must be substantially related to an important governmental objective with exceedingly persuasive justification. *(People v Liberta,* 64 NY2d 152, 170 [1984].)* There is no justification for excluding a man or a woman as a juror because of gender.

█ This court concludes that the defendant in this case, a man, has standing to attack the use of peremptory challenges against women on State equal protection grounds. The State did not object to the challenge. *(People v Chestnut,* 26 NY2d 481 [1970]; *see, People v Wells,* 89 AD2d 1020, 1022 [2d Dept 1982], *affd* 60 NY2d 403.)*

In addition, defendant meets all the requirements vesting him with third-party standing. *(See,* Tribe, American Constitutional Law § 3-19, at 134 [2d ed 1988].)* The defendant here made a claim of injury to his right to a jury selected without gender bias. He can thereby assert an injury to himself which derives from the denial of the jurors' equal protection right not to be challenged based on gender. *(Eisenstadt v Baird,* 405 US 438, 444-446 [1972]; *Griswold v Connecticut,* 381 US 479, 481 [1965]; *Barrows v Jackson,* 346 US 249, 255-257 [1953]; *Pierce v Society of Sisters,* 268 US 510 [1925].)[28] Further, jurors are unable to protect their interests. Jurors are unaware of the colloquy relating to the challenges; they are unaware of

---

**27.** In *People v Merkle* (143 AD2d 145 [2d Dept 1988]), the Second Department declined to decide the issue, finding it unnecessary to do so because the People provided non-gender-related reasons for the challenges.

**28.** This court cites these cases for principles it will accept as a matter of State law.

the existence of the requisite pattern for raising the challenges; they cannot intrude on the criminal proceedings because they are not parties; they have little ability to pursue an independent time-consuming challenge to the litigants' conduct. *(See, People v Gary M.,* 138 Misc 2d 1081, 1092 [Sup Ct, Kings County 1988].)

B. *Federal Constitutional Protections*

■ The Federal Constitution protects the right of a defendant to a fair and impartial petit jury by precluding improper exclusion of racial groups from jury membership. The Federal protections derive from the Fourteenth Amendment Equal Protection and Due Process Clauses and the Sixth Amendment Impartial Jury Clause as applied to the States. The question in this case is whether the application of these principles prevents the use of peremptory challenges to exclude potential jurors based on gender. This court finds that under either Federal constitutional theory, gender-based challenges used to exclude women are unconstitutional.

### 1. FEDERAL EQUAL PROTECTION CLAUSE

*Batson v Kentucky* (476 US 79, *supra)* applies the Equal Protection Clause of the Fourteenth Amendment to preclude use of peremptory challenges to eliminate individuals from petit juries based on race. However, *Batson* leaves unresolved several issues necessary to determine whether the Equal Protection Clause applies here: first, does the clause apply to prevent gender-based discrimination; second, may the prosecutor's reasons for the use of peremptory challenges against women be qualitatively different (lower) than those given to justify the use of peremptories against racial groups; and, finally, does the defendant have standing to seek protection when he and the challenged jurors are not of the same group.

Although *Batson (supra)* expressly deals with discrimination based on race, and *Strauder v West Virginia* (100 US 303 [1879]), frequently cited in *Batson,* expressly authorizes limiting jurors to males *(supra,* at 310), it is clear by now that the Equal Protection Clause restricts government action based on gender, whether the policy affects men or women. *(See, e.g., Mississippi Univ. for Women v Hogan,* 458 US 718, 723-724 [1982].)* The restriction on gender-based activity necessarily requires the *Batson* principles be applied to gender-based peremptory challenges to jurors.

■ A question might be raised whether after the defendant

makes a prima facie showing that the challenges are gender based *(see, infra,* at 815), the quality of the reasons given by the State to justify the challenges to women can satisfy by meeting the less than strict scrutiny standard applied to gender-based conduct rather than the strict scrutiny test applied to racially based conduct. However, *Batson (supra)* uses a different test to justify use of peremptory challenges based on forbidden classes: the reasons must be independent of the juror's membership in a protected class. *Batson* requires a race-neutral reason for use of peremptories. In the context of peremptory challenges, use of different tests to justify challenges to men and women and racial groups must be rejected as impossible of application. Further, different tests are not necessary. The specific characteristics which justify the challenge of a particular juror are of a sufficiently broad range so that the Trial Judge is in a position to evaluate whether the challenge is either independent of the category, is overtly gender based, or is pretextual.

The final issue is the one of cross grouping, that is, allowing a defendant to claim a denial of equal protection if the improperly challenged jurors are not of his group. Some of *Batson's* language focuses on the common group membership of the defendant and the excluded jurors: "The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race". *(Batson v Kentucky,* 476 US 79, 86, *supra.) Strauder's* language is similar: "The very idea of a jury is a body of men composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds." *(Strauder v West Virginia,* 100 US 303, 308, *supra; see also,* 309, 310.)

However, in *Strauder (supra), Swain v Alabama* (380 US 202 [1965]) and *Batson (supra),* the concern is not only with application of the Equal Protection Clause to defendants, but to jurors as well. *(See, Peters v Kiff,* 407 US 493, 499, *supra* [opn of Marshall, J., for Douglas and Stewart, JJ.].) A person has a right not to be excluded from jury service because of membership in a particular group. *(Strauder v West Virginia,* 100 US, *supra,* at 308) In *Batson,* citing *Strauder,* the court wrote: "Racial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try. Competence to serve as a juror ultimately depends on an assessment of individual qualifications and ability impartially

to consider evidence presented at a trial. * * * A person's race simply, 'is unrelated to his fitness as a juror.' * * * As long ago as *Strauder,* therefore, the Court recognized that by denying a person participation in jury service on account of his race, the State unconstitutionally discriminated against the excluded juror". *(Batson v Kentucky, supra,* 476 US, at 87.)

These Federal precedents warrant application of the Equal Protection Clause to protect the rights of jurors. They provide the basis for allowing a defendant's challenge to the use of peremptories based on gender or other suspect class even if the defendant is not a member of the same group as the excluded jurors. The same reasoning that applied to allow third-party standing in State court applies equally to the Federal law analysis.

### 2. SIXTH AMENDMENT CLAUSE

■ As essential component of the Sixth Amendment right to a jury trial is that the petit jury be selected from a representative cross section of the community. Procedures which discriminate against membership by women in the venire have been held to violate the right to a jury of a cross section of the community in *Taylor v Louisiana* (419 US 522, *supra)* and *Duren v Missouri* (439 US 357, *supra).*

*Duren (supra)* and *Taylor (supra)* were concerned with selection of the venire. The concern in this case is with the next step in the process, that of the selection of the petit jury from the venire. As earlier explained *(supra,* at 806–807), the principles applicable to the selection of the venire must necessarily apply equally to the selection of the petit jury to give a defendant an opportunity for a jury composed of a cross section of the community. There is inherent inconsistency in eliminating discriminatory practices in one phase of the process, and then permitting conduct which reintroduces discrimination into the jury selection process. The principles have been succinctly stated by the Second Circuit: "The venire *qua* venire is a body that, assuredly, gives service to the community by standing ready to serve on a petit jury if called upon to do so; but it is a group that takes no action and makes no decisions. No defendant has ever been tried before a venire; the venire is not the body that deliberates in the jury room; no defendant has ever been found guilty by a venire. If there is a Sixth Amendment requirement that the venire represent a fair cross section of the community, it must logically be

because it is important that the defendant have the chance that the petit jury will be similarly constituted. The necessary implication is that the Sixth Amendment guarantees the defendant that possibility. It guarantees not that the possibility will ripen into actuality, but only the fair and undistorted chance that it will. We thus agree that the Sixth Amendment does not require any action to ensure that the representative character of the venire be carried over to the petit jury; we think the Amendment simply prohibits the state's systematic elimination of the possibility of such a carry-over." *(McCray v Abrams,* 750 F2d 1113, 1128-1129, *supra.)*

*Batson's* reliance entirely on the Equal Protection Clause to prevent discrimination in jury selection does not detract from the Sixth Amendment protection. The two reasons are doctrinally separate. Further, *Batson* explicitly declined to rule on the merits of the Sixth Amendment claim made in the case. *(Batson v Kentucky, supra,* 476 US, at 84-85, n 4.) Finally, the decision in *Lockhart v McCree* (476 US 162 [1986]) is sufficiently ambiguous not to undermine the Sixth Amendment analysis. The majority in *Lockhart* refused to apply the "fair cross-section requirement" to petit juries. However, it is not the fair cross-section requirement that is applicable to petit juries. As the United States Supreme Court noted, the fair cross-section principle has not required that the jury mirror composition of the community,[29] and as applied to the petit jury the test is to preclude only gender-based exclusion to allow the opportunity for a jury of a fair cross section. *(Roman v Abrams, supra,* 822 F2d 214, 226.) Due to this ambiguity in analysis, it seems that the alternate basis for the decision in *Lockhart* will be the one which is controlling: that "Witherspoon excludables" and other groups defined by shared attitudes do not constitute distinctive groups in the community which need be considered in evaluating a fair cross section.

Based on established precedent, the defendant need not be a

---

**29.** In 1880, in connection with its equal protection analysis, the Supreme Court wrote that there is no right to have members of one's race on a jury and a mixed jury is not absolutely the "right to which [a defendant] is entitled [to be] 'that in the selection of jurors to pass upon his life, liberty, or property, there shall be no exclusion of his race, and no discrimination against them, because of their color.' " *(Neal v Delaware,* 103 US 370, 394 [1880].) The same statement was repeated in *Akins v Texas* (325 US 398, 403 [1945]) and *Cassell v Texas* (339 US 282, 286 [1950]). That is the uncontradicted Federal law *(see, Taylor v Louisiana,* 419 US 522) and State law. *(People v Guzman,* 60 NY2d 403 [1983], *cert denied* 466 US 951 [1984]; *People v Parks,* 41 NY2d 36 [1976].)

member of the challenged group to seek a remedy for denial of the opportunity to have a jury composed of a fair cross section of the community. *(Duren v Missouri, supra; Taylor v Louisiana, supra,* 419 US, at 528; *Peters v Kiff,* 407 US 493, *supra.)* The defendant is entitled to participation of the excluded group and to the range of "qualities of human nature and varieties of human experience" *(Peters v Kiff, supra,* 407 US, at 503).

## II. PRIMA FACIE CASE AND THE RESPONSE

### A. *The Legal Tests*

Under *Batson (supra),* a challenge to the use of peremptory challenges based on violation of the State and Federal Equal Protection Clauses must be premised on a showing of a prima facie case of purposeful discrimination in the selection of the petit jury solely upon an examination of the use of the challenges. The proof assumes that peremptory challenges provide an opportunity to discriminate. The challenge must show that members of a cognizable racial group were challenged, and the circumstances must give rise to an inference that the challenges were used to eliminate potential jurors based on race. Should a prima facie showing be made, the party exercising the peremptory challenges must provide neutral reasons unrelated to group membership to justify the challenges. *(People v Mack,* 143 AD2d 280 [2d Dept 1988]; *People v James,* 132 AD2d 932 [4th Dept 1987]; *People v Baysden,* 128 AD2d 795 [2d Dept], *lv denied* 70 NY2d 798 [1987]; *People v Simpson,* 121 AD2d 881 [1st Dept], *lv denied* 68 NY2d 773 [1986]; *People v Hockett,* 121 AD2d 878 [1st Dept 1986].)

This court concludes that this test should be applied to evaluate assertions of gender-based use of peremptory challenges. The test is consistent and analogous with the standards applied by the New York courts to evaluate challenges to improper exclusions from the Grand Jury and jury pools or venire *(see, e.g., People v Guzman,* 60 NY2d 403, *supra; People v Parks,* 41 NY2d 36 [1976]; *People v Chestnut,* 26 NY2d 481 [1970]; *People v Horton,* 18 NY2d 355 [1966], *cert denied* 387 US 934 [1967]; *People v Agron,* 10 NY2d 130, *cert denied* 368 US 922 [1961]), and with the Federal test. *(Taylor v Louisiana,* 419 US 522, *supra.)*

### B. *The Proof of a Prima Facie Case*

An examination of the record of the jury selection proceed-

ings in this case shows that a prima facie case was established by defense counsel.[30]

Thirty-six potential jurors were questioned in voir dire in three groups. The first group consisted of 16 potential jurors. After voir dire, challenges were made to the first 12 of the 16. That group of 12 consisted of 6 women (Nos. 1,[31] 2, 3, 5, 9 and 10)[32] and 6 men. One of the women (No. 3) was challenged for cause. The prosecutor challenged the remaining 5 women peremptorily. The defense counsel made his first objection to the challenges at this point. Challenges were then exercised against the remaining 4 of the group of 16. That group consisted of 1 woman (No. 15) and 3 men. The prosecutor peremptorily challenged the woman and 1 man.

The second group of potential jurors questioned on voir dire consisted of 16 people. After voir dire, challenges were made to the first 7 of the group.[33] Of the 7, 2 (Nos. 5[34] and 6) were women. The defense peremptorily challenged number 5. The prosecutor peremptorily challenged number 6 but challenged no men. Defense counsel noted the prosecutor's challenge to a woman. Of the next 2 of the 16, 1 was a woman (No. 9) and the prosecutor peremptorily challenged her. He did not challenge the man. Again, defense counsel noted the challenge. In the next group of 3, 1 was a woman (No. 12). She was not challenged. One man was challenged for cause; the prosecutor did not peremptorily challenge the other males. Of the next 2 jurors, both were men[35] and neither was challenged. The next

---

**30.** The transcript of the jurors' answers to the court's voir dire questions is complete. However, because the prior practice was not to record counsel's remarks to the jury, those remarks are only partially recorded. This court's practice has been changed to record the entire proceeding.

**31.** The transcript reads that the potential juror No. 1 was named Pedro Dellacruz. However, later portions of the transcript and, other records show that is incorrect. Potential juror No. 1 was replaced by Hilda Constanza after the man was excused on consent, and the juror was a woman.

**32.** The transcript has juror No. 10's name as Ruiz Paley. Other records show it was, in fact, Louise Bailey.

**33.** The number of potential jurors considered from the 16 was equal to the number of seats to be filled, or the number remaining on the panel. The first 7 were equal to the remaining number of jurors needed to complete the jury.

**34.** The transcript reads that No. 5 was named John Wandwood or Candlewood. Records show the potential juror was a woman named Joan Catherword.

**35.** The transcript reads that potential juror No. 13 was named Marianne Smith. Other records show this was incorrect and that the juror was a man.

2 jurors were considered to be alternate jurors. One (No. 16) was a woman and was challenged by the prosecutor. He did not challenge the man. The defense noted the challenge.

After voir dire of 4 additional panel members, the first, a woman, was chosen as the second alternate.

■■ The court found that the challenges to the female jurors establish a prima facie case of gender-based use of peremptories. Against a panel of an unusually high number of men for a Bronx jury, the prosecutor challenged 9 women and only 1 man. The way in which the peremptories were used showed an apparent attempt to rid the jury of women. The single woman left as a juror was allowed to remain only after defense counsel repeatedly noted his objection to the prosecutor's conduct. The women challenged were of diverse employment and family backgrounds, and for the most part the voir dire provided no antiprosecution inclination. To the contrary, several had police officer relatives or had been crime victims. The men who were not challenged disclosed information about themselves similar to the women who were challenged. *(People v Mack,* 143 AD2d 280, *supra; People v Hernandez,* 140 AD2d 543 [2d Dept 1988]; *People v Gregory ZZ.,* 134 AD2d 814 [3d Dept 1987], *lv denied* 71 NY2d 905 [1988]; *People v James,* 132 AD2d 932, *supra* [4th Dept 1987].)

C. *The Prosecutor's Reasons*

The prosecutor was asked to provide explanations for the exercise of his peremptory challenges against women. To evaluate the reasons given, the court considered that the complaining witness was the aunt of the defendant, and that both the complaining witness and the eyewitness were women. The assistant gave the following reasons:

FIRST GROUP:

Juror No. 1: Command of English was not good; it did not appear that she understood the questions.

Juror No. 5: Appeared smiling during questioning; had no children; was not married and did not seem to take the case seriously because it was a crime as between related people.

Juror No. 9: Seemed uninterested in the questions; sometimes appeared sleepy; talked to juror 10; refused to look at the prosecutor and appeared to be looking toward the defense table; hesitated when asked if she could be fair and impartial.

Juror No. 10: Talked to juror number 9; she refused to look at the prosecutor and made eye contact with the defense.

Juror No. 15: Appeared nervous, shy and timid; would not be comfortable with the relationship between the defendant and complaining witness.

SECOND GROUP:

Juror No. 6: Wanted to hear both sides of a story to find the middle ground; sarcastic responses to questioning by the prosecutor which showed she was "put off" by him.

Juror No. 9: Said she would not change her mind once she formed an opinion.

Juror No. 16: Not attentive during questioning and unable to make eye contact with the juror.

█ The court finds that the challenges to potential jurors Nos. 1, 9 and 10 of the first group and potential jurors Nos. 6 and 9 of the second group were objectively based and premised on non-gender-related reasons. The remaining four challenges are subjectively based, and require a careful appraisal of the prosecutor's credibility. This court accepts that the prosecutor's challenge to juror No. 2 of the first group, that she did not have the personality to be a foreperson of a jury, is nongender based and genuinely held by the prosecutor. However, the court notes that the challenge is premised on a misunderstanding of the role of a foreperson who is merely one among equals charged with the burden of scribe (not always fulfilled in person) and reader of the verdict.

The prosecutor explained his challenge to juror No. 5 in the first group as a lack of seriousness about the case because of the familial relationship between the defendant and the complaining witness. He said he reached the conclusion because the juror was not married and had no children. The court accepts that as a gender-neutral reason. Juror No. 15 was challenged because she was shy and timid and would not be comfortable with the relationship between the complaining witness and the defendant. The court concludes this challenge was pretextual. There is no basis for connecting shyness with discomfort about the circumstances of the case. Further, there was no objective basis for finding the juror shy.

Finally, the prosecutor explained his challenge to juror No. 16 of the second group, as based on her inattentiveness to questions and the prosecutor's inability to make eye contact with her. The court finds this reason to be pretextual and therefore not based on grounds independent of gender.

█ The motion for a mistrial is denied because the failure

to justify on grounds independent of gender 2 of 9 challenges does not warrant a finding of improper use of peremptories. *(See, People v Merkle,* 143 AD2d 145 [2d Dept 1988].)

Accordingly, this court finds the prosecutor's use of peremptory challenges was not unlawful. The motion for a mistrial is denied.