581 So.2d 536 (1990)
William Eltoria DANIELS
v.
STATE.
CR 89-447.
Court of Criminal Appeals of Alabama.
September 21, 1990.
Rehearing Denied January 18, 1991.
*537 L. Dan Turberville, Birmingham, for appellant.
Don Siegelman, Atty. Gen., and Martha Gail Ingram, Asst. Atty. Gen., for appellee.
TAYLOR, Presiding Judge.
The appellant, William Eltoria Daniels, was convicted of the murder of Dewey Willard Early as defined by § 13A-6-2, Code of Alabama 1975, and was sentenced to 25 years' imprisonment.
The evidence presented by the State tended to establish that late in the afternoon or early on the evening of August 29, 1987, Barbara Carpenter had taken her young daughter to a park near Sixth Avenue North and 25th Street in downtown Birmingham. While Ms. Carpenter and her daughter were in the park, Ms. Carpenter observed two men taking photographs of one another. One of the men was wearing a red shirt and was sitting on a automobile parked on 25th Street next to the park. The other man was "kind of in the street." She recognized the man standing in the street as the appellant, William Eltoria Daniels, an acquaintance of her brother's. After approximately 15 minutes, Ms. Carpenter noticed a truck coming down 25th Street toward the appellant. As the truck passed by appellant, its rearview mirror either almost touched appellant or barely grazed him. The appellant jumped in his automobile, a beige or cream-colored Chevrolet Monte Carlo, and sped down the street in pursuit of the truck.
In his haste to catch the truck, the appellant failed to turn on his car's headlights and almost collided head-on with a car being driven down 25th Street by Derrick Blackmon. (Apparently, appellant was parked against the oncoming traffic, and had to make a U-turn to follow the truck.) All three vehiclesthe truck, the Monte Carlo, and Derrick Blackmon's Chevrolet Camaro automobilecame to a stop at the intersection of Sixth Avenue North and 25th Street. The appellant's Monte Carlo was in the right lane, the truck was in the center lane, and Blackmon's Camaro was in the left lane. While the three vehicles were stopped for the red light, the appellant *538 got out of his car and went over and began to scream and curse at the driver of the truck, an elderly man later identified as the victim, Dewey Willard Early.
Kim Bryant, Derrick Blackmon's girlfriend, was riding in the passenger seat of Blackmon's Camaro and was the closest witness to the appellant's encounter with Mr. Early. She stated that when the appellant started screaming and cursing at Mr. Early, he looked at appellant as if he "didn't know what was going on." In Ms. Bryant's words, "He [Mr. Early] was like in amazement." The appellant was screaming "you can't do that to me" at Mr. Early when a man in a red shirt walked up and tried to stop the appellant. About this time, the light changed to green and Mr. Early started to pull away from the intersection. The appellant then began firing a pistol through the rear windshield of the truck. He fired at least five shots. The truck then struck two cars and a pedestrian prior to coming to rest against a utility pole. The appellant got into his car and left the scene. His friendthe man in the red shirtwalked away.
Officer C.D. McKay of the Birmingham Police Department was the first officer on the scene. He received the call at 8:20 p.m. He observed that the truck had hit two cars and a pedestrian. There was a bullet hole in the side of the truck and a bullet had come through the truck's rear windshield, shattering it. The driver of the truck had also been struck by some of the bullets and was unconscious. He was taken to a local hospital and treated for his injuries. However, Mr. Early died five to six weeks after the incident as a result of a gunshot wound to the neck that damaged his spinal cord. Pneumonia resulting from the gunshot wound was the secondary cause of death.

I
The appellant first contends that the State violated his constitutional right to equal protection under the law by using all of its peremptory challenges to remove eight white women and one black woman from his jury. Specifically, the appellant seeks to extend the rule of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to gender-based strikes.
This issue has not yet been addressed by any Alabama court. However, numerous other jurisdictions have made it clear that Batson does not extend to gender-based strikes by a prosecutor. In United States v. Hamilton, 850 F.2d 1038 (4th Cir.1988), cert. dismissed sub nom. Washington v. United States, 489 U.S. 1094, 109 S.Ct. 1564, 103 L.Ed.2d 931 (1989), cert. denied, Hamilton v. United States, ___ U.S. ___, 110 S.Ct. 1109, 107 L.Ed.2d 1017 (1990), the Court of Appeals for the Fourth Circuit rejected the argument that the Equal Protection Clause compelled an extension of Batson, supra, to peremptory challenges on the basis of gender. That Court stated that while it did not approve of striking jurors for any reason related to some group classification, it found no authority to extend Batson beyond instances of racial discrimination.
"Although the Court in Batson relaxed the evidentiary burden of Swain [v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) ], it offered no intimation that it was extending the equal protection safeguards involving peremptory strikes to gender: `By requiring trial courts to be sensitive to the racially discriminatory use of peremptory challenges, our decision enforces the mandate of equal protection and furthers the ends of justice.' 106 S.Ct. at 1724 (emphasis added). While the strictures of the Equal Protection Clause undoubtedly apply to prohibit discrimination due to gender in other contexts, there is no evidence to suggest that the Supreme Court would apply normal equal protection principles to the unique situation involving peremptory challenges.
"....
"Clearly, if the Supreme Court in Batson had desired, it could have abolished the peremptory challenge or prohibited the exercise of the challenges on the basis of race, gender, age or other group classification. A careful examination of the Batson opinion, however, leads this *539 Court to the firm conclusion that, in light of the important position of the peremptory challenge in our jury system, the Court intended Batson to apply to prohibit the exercise of peremptory challenges on the basis of race only."
850 F.2d at 1042-43. Other jurisdictions have also held that Batson does not apply to gender-based peremptory challenges. See, e.g., Mowbray v. State, 788 S.W.2d 658 (Tex.Ct.App.1990); State v. Culver, 233 Neb. 228, 444 N.W.2d 662 (1989); Hannan v. Commonwealth, 774 S.W.2d 462 (Ky. App.1989); State v. Adams, 533 So.2d 1060 (La.App.1988), cert. denied, 540 So.2d 338 (La.1989); State v. Oliviera, 534 A.2d 867 (R.I.1987). But see People v. Irizarry, 142 Misc.2d 793, 536 N.Y.S.2d 630 (1988) (Batson applies to gender-based peremptory challenges).
In People v. Crowder, 161 Ill.App.3d 1009, 113 Ill.Dec. 798, 801, 515 N.E.2d 783, 786 (1987), appeal denied, 119 Ill.2d 562, 119 Ill.Dec. 390, 522 N.E.2d 1249 (1988), a case factually similar to the instant case, the Illinois Court of Appeals held that a male defendant had no standing to request a Batson hearing when the prosecution had used its peremptory challenges to exclude women from the jury. It was not clear, however, whether that court ruled that the defendant had no standing because he was male and the strikes were against women or because no question of race was involved.
In our view, Batson offers no authority for the extension of the principles contained therein beyond racial discrimination. If such an extension is to be warranted, we think it best that it be done by the United States Supreme Court or the Alabama Supreme Court. In light of this holding, no basis for reversal exists.

II
The appellant next contends that the trial court erred in allowing the State to impeach its own witness. Specifically, the appellant contends that the prosecutor was erroneously allowed to question Barbara Carpenter concerning a prior inconsistent statement.
Ms. Carpenter testified on direct examination that she saw the victim's truck go by and possibly brush the appellant with its rearview mirror. She said that the appellant then jumped in his car and followed the truck down the street and that at the intersection of Sixth Avenue North and 25th Street, the appellant jumped out of his car, ran over to the driver's side of the truck, and began arguing with the driver, Mr. Early. Ms. Carpenter testified that she did not see a gun, but that she heard gunshots. She further testified that the appellant then got into his car and sped off.
On cross-examination, however, Ms. Carpenter stated that she had been contacted several times by the police and the district attorney's office about this particular case. According to Ms. Carpenter, she was offered a reward if she would testify. She also admitted that she had earlier given an investigator for an attorney a written statement that she had signed in which she stated that she knew nothing about this case, and did not actually see the shooting, only heard some gunshots.
On redirect, Ms. Carpenter again testified that she observed appellant in the street talking to the man in the truck. The prosecutor asked Ms. Carpenter several questions about the statement she made to the investigator. Ms. Carpenter admitted that she did not actually write that statement, nor did she read what the investigator had written down before she signed it. The prosecutor then asked Ms. Carpenter whether she talked with Sergeant Forrest Duncan two days after this incident. It was at this point that defense counsel objected on the grounds that the prosecutor was about to impeach her own witness. The prosecutor responded that she was surprised by Ms. Carpenter's statement that she knew nothing about the case and wanted to impeach her. The trial judge ruled that the State could examine Ms. Carpenter as to her inconsistent statement. The State then continued its questioning of Ms. Carpenter. However, she denied telling Sergeant Duncan that she had seen appellant shoot the victim.
*540 In addressing this issue, we wrote as follows in Hamilton v. State, 520 So.2d 155, 161-62 (Ala.Cr.App.1986), aff'd, 520 So.2d 167 (Ala.1987), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988):
"When the testimony of a witness is adverse to the party who called the witness, it is proper for the trial court to allow that party, either for the purpose of proving surprise or to refresh the witness's recollection, to question the witness regarding prior inconsistent statements. Bell v. State, 466 So.2d 167 (Ala.Cr.App.1985); Walker v. State, 416 So.2d 1083 (Ala.Cr.App.1982); Dennard v. State, 405 So.2d 408 (Ala.Cr.App.1981); see also C. Gamble, McElroy's Alabama Evidence, § 165.01(7)(a) (3d ed. 1977). Ordinarily, a suggestion by counsel that he is surprised by the testimony of his own witness is a sufficient basis for the trial court to allow the counsel to elicit testimony regarding the prior inconsistent statement. Junior v. State, 411 So.2d 850 (Ala.Cr.App.1981); Dennard; McElroy's, § 165.01(7)(c)."
Here, we find that the prosecutor was genuinely surprised by the testimony of her own witness and was attempting to show that what the witness had said in the written statement given to an investigatorthat she didn't know anything about the shootingwas inconsistent in view of the fact that the witness had told the police two days after the shooting that she had seen the appellant do the shooting. Thus, the prosecutor was properly allowed to impeach her witness by questioning her as to prior statements to the police that were inconsistent with the statements elicited on cross-examination.

III
Appellant's final contention of error is that the State's evidence adduced at trial was insufficient to support his conviction for murder.
Where a motion for judgment of acquittal is made at the close of the State's case, the trial court has a duty to determine the sufficiency of the evidence to sustain a conviction under the indictment by considering the evidence before the jury at the time of the motion, considering the evidence in the light most favorable to the State. Faircloth v. State, 471 So.2d 485, 489 (Ala.Cr.App.1984), aff'd, 471 So.2d 493 (Ala.1985). Further, where the evidence, if believed, is sufficient to sustain a conviction, denial of the motion does not constitute error. Parrish v. State, 494 So.2d 705, 709 (Ala.Cr.App.1985). Viewing the State's evidence presented to the jury, which is set out above, in light of these principles, we find that when viewed in the light most favorable to the prosecution, the evidence was more than sufficient to allow the jury to reasonably find that the appellant was guilty of the intentional murder of Dewey Willard Early. Thus, the evidence presented at trial was sufficient to sustain the appellant's conviction.
The appellant received a fair trial. Therefore, the judgment of the trial court is due to be, and is hereby, affirmed.
AFFIRMED.
All the Judges concur, except BOWEN, J., who concurs in part and dissents in part, with opinion.
BOWEN, Judge, concurring in part, dissenting in part.
I concur in Parts II and III of the majority opinion. I dissent from Part I in which the majority concludes that Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and implicitly Ex parte Branch, 526 So.2d 609 (Ala.1987), "offers no authority for the extension of the principles contained therein beyond racial discrimination." Yet, the issue in this case is whether a gender-based discrimination in the selection of a jury in the prosecution of a defendant for a criminal offense is constitutional under the Constitution of the State of Alabama. I recognize that the weight of the authority from other jurisdictions supports the position of the majority. However, whatever the Constitution of the United States may provide, or not provide, it is clear that sections 1 and 6 of Article I of the Alabama Constitution of 1901 and § 12-16-55, Ala.Code 1975, prohibit such a practice. Section 1 of our constitution "is *541 no empty parade of words: it means, and was intended to guarantee to each citizen, all the rights or privileges which any other citizen can enjoy or possess." In re Dorsey, 7 Port. 293, 360-61 (1838). "According to our constitution, `All men are created equal;' and the word `man' includes persons of both sexes." O'Neal v. Robinson, 45 Ala. 526, 534 (1871), overruled on other grounds, Weil & Brother v. Pope, 53 Ala. 585, 589 (1875). "[I]t is well-recognized that rights under state constitutions, including rights very similar to those protected by the federal constitution, are sometimes regarded as being more extensive than their federal counterparts." Ex parte Caffie, 516 So.2d 831, 837 (Ala.1987).
Batson, as interpreted in Branch, may have opened Pandora's box and may "ultimate[ly] result, in the not too distant future,... [in] the loss of all peremptory challenges in the criminal jury selection process." Ex parte Lynn, 543 So.2d 709, 714 (Ala.1988) (Jones, J., concurring specially), cert. denied, ___ U.S. ___, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989). However, whatever the result, this Court should not ignore the fact that it has been opened.